Daniel E. **GEER**, Jr., et al., Plaintiffs,

v.

**FEDERAL HIGHWAY ADMINISTRATION,** et al., Defendants.

**CITY OF CAMBRIDGE,** Plaintiff,

v.

**FEDERAL HIGHWAY ADMINISTRATION,** et al., Defendants.

Civil Action Nos. 95–10147–DPW, 95–10500–DPW.

United States District Court, D. Massachusetts.

Aug. 4, 1997.

---

Raymond Miyares, Thomas J. Harrington, Pickett & Miyares, Boston, MA, for Daniel E. Geer, Jr., Andreas Aeppli, Robert L. Bencher, Robin Bencher, Mark Browne, Mary Ellen Coyle Browne, Catherine A. Burke, David P. Burns, Renee DiPrima Burns, William Cavellini, Katherine J. Coffey, Vincent Lawrence Dixon, Astrid A. Dodds, Douglas W. Dodds, Jr., R. Philip Dowds, K. Dun Gifford, Mark H. Jenkins, Dean R. Johnson, Joseph Joseph, Rosemary A. Keverek, Daniel T. King, Elaine Kistiakowsky, Catherine A. Lewis, Anne R. Lindsay, Louise Lewis, Henry Lukas, John W. MacDonald, Donald Maciver, George McCray, Debra McManus, Peter Murtha, Frederick C. Reece, S. Rivitz, Peter W. Roudebush, Rose Marie A. Ruggerio, Hugo Salemme, Phillip Sego, Bette L. Task, Anne Rawlings Toop, Joanne J. Turnbull, T. Underwood, Richard J. Vendetti, Melinda L. Walch, Cambridge Citizens for Liveable Neighborhoods, Inc., Charles River Watershed Association, Committee for Regional Transportation, Priscilla McMillan.

Edward F. Lawson, Weston, Patrick, Willard & Redding, Boston, MA, for Cambridge, City of, Consolidated Plaintiff.

George B. Henderson United States Attorney's Office, Boston, MA, Phyllis N. Crockett, Pierce O. Cray, Attorney General's Office, Boston, MA, for Federal Highway Administration, Rodney E. Slater, Stephen A. Moreno, Massachusetts Highway Department, Laurinda T. Bedingfiled, Donald Hammer, William Weld, James J. Kerasiotes, Metropolitan District Commission and David Balfour.

### MEMORANDUM AND ORDER

WOODLOCK, District Judge.

In a Record of Decision dated June 9, 1994, the Federal Highway Administration ("FHWA")[1] approved the design selection made by the Massachusetts Department of Highways ("MHD") for crossing the Charles River as part of the Central Artery/Tunnel ("CA/T") Project now underway to upgrade the highway system in the city of Boston. Innumerable design alternatives were considered for the Charles River Crossing. The design selected is known as the Non–River Tunnel ("NRT") alternative and consists of two parallel bridges. One bridge is a ten-lane cable-stayed mainline bridge; the other is a four-lane girder bridge.

The FHWA contends that the NRT is the best overall alternative for the Charles River Crossing because it is safe, environmentally appropriate, and minimizes harm to parkland and historic resources. The FHWA argues in this connection that an extensive ancillary program of parkland creation will improve blighted industrial areas of the lower Charles River.

By contrast, the plaintiffs in these consolidated actions contend a crossing that substitutes tunnelling under the Charles River for the girder bridge is a more appropriate alternative because it would reduce impacts on parklands administered by the Metropolitan

---

1. This case, like many environmental disputes, involves an alphabet soup of acronyms for agencies, design alternatives, reports and studies. A dictionary of acronyms is attached as Appendix I to this Memorandum.

District Commission ("MDC"). The decision not to select such an alternative, plaintiffs argue, was the consequence of the failure of the FHWA to follow the directives of environmental regulatory schemes enacted by Congress.

Before me are cross-motions for summary judgment presenting two basic questions:

1. Whether the FHWA complied with the National Environment Policy Act, 42 U.S.C. § 4321, *et seq.* ("NEPA"), in its selection of the NRT alternative; and

2. Whether the NRT alternative complied with the requirements imposed by § 4(f) of the Department of Transportation Act[2] for the protection of parklands.

After providing a chronological overview of the project planning leading to the selection of the NRT and a procedural history of the case, I will address the two questions in order.

These questions implicate distinct Congressional approaches. Evaluating compliance with NEPA is essentially a procedural analysis. Congress was not concerned with securing particular substantive decisions through NEPA; rather the intent was to insure that decision-making was fully informed by the relevant environmental considerations. "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow*

*Valley Citizens Council*, 490 U.S. 332, 350, 109 S.Ct. 1835, 1845–46, 104 L.Ed.2d 351 (1989). The focus sharpens and the perspective changes considerably when compliance with § 4(f) is evaluated. There, in addition to certain procedural concerns, Congress sought to establish an important substantive goal: a national policy "that special effort would be made to preserve the natural beauty of the country-side and public park and recreational lands.'" 49 U.S.C. § 303(a).

After extended and systematic review of the massive record in this case, I am satisfied that the selection of the NRT was in compliance with both NEPA and § 4(f). Accordingly, I will allow defendants' motions for summary judgment.

## I.

## PROJECT HISTORY

The CA/T Project underwent more than a decade of administrative environmental review process. That process is perhaps most easily understood when presented as a chronology focussing on review of the Charles River Crossing evaluations.

*1982:* FHWA and MHD[3] issued a Draft Environmental Impact Statement and Report ("DEIS/R'")[4] regarding the Project.

*1983:* The agencies issued a Supplemental DEIS/R ("SDEIS/R'").

---

2. What is commonly referred to as § 4(f), now recodified at 49 U.S.C. § 303, *see also* 23 U.S.C. § 138, provides:

(a) It is the policy of the United States Government that special effort should be made to preserve the natural beauty of the country-side and public park and recreation lands, wildlife and waterfowl refuges, and historic sites.... (c) The Secretary may approve a transportation program or project ... requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance (as determined by the Federal, State or local officials having jurisdiction over the park, area, refuge, or site) only if— (1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm to the park, recre-

ation area, wildlife and waterfowl refuge, or historic site resulting from the use.

3. Before January 1992, the MHD was called the Massachusetts Department of Public Works. To avoid undue confusion, this state highway authority is referred to as the MHD throughout this Memorandum.

4. The evaluative document under the federal NEPA process is termed an Environmental Impact *Statement*. Under the Massachusetts Environmental Policy Act ("MEPA"), Mass.Gen.L. ch. 30 §§ 61, *et seq.*, the evaluative document is known as an Environmental Impact *Report*. Because, for the most part, the CA/T Project environmental review under NEPA and MEPA proceeded on parallel tracks, the several evaluative documents are generally referred to throughout this Memorandum in their draft, supplemental and final forms as Environmental Impact Statements and Reports ("EIS/R").

*August 1985:* The Final EIS/R for the Project was published ("1985 FEIS/R"). This document identified a preferred alternative for the Charles River Crossing component. This preferred alternative design had four bridges, including two I–93 mainline truss bridges, one on either side of the existing bridge, which rejoined I–93 north of the Gilmore Bridge in Charlestown; and ramps connecting the Central Artery to Storrow Drive/Leverett Circle in a tunnel under the North Station commuter rail tracks and along and partly in the south bank of the Charles River.

The 1985 FEIS/R included a § 4(f) analysis regarding two identified parkland resource areas: first, the Charles River Basin Reservation along Storrow Drive, including the Charles River upstream of the Old Charles River Dam; and second, Paul Revere Landing Park, on either side of the river next to the New Charles River Dam. The FEIS/R also noted that the Metropolitan District Commission ("MDC") had plans to acquire land downstream of the old dam to the New Charles River Dam. The Massachusetts Executive Office of Transportation and Construction ("EOTC") and the MHD agreed to work with the MDC to facilitate park acquisitions in order to mitigate impacts to Paul Revere Landing Park. The document outlined mitigation measures for the land between the old and new dams.

Upon review, the Secretary of the Massachusetts Executive Office of Environmental Affairs ("EOEA") directed that the Charles River Crossing be reexamined.

*May 1990:* A ten-volume DSEIS/R was issued ("1990 DSEIS/R"). It described changes to the project and addressed issues left outstanding in the 1985 FSEIS. In addition, it noted that thirty-one design options had been evaluated as alternatives to the 1985 Charles River Crossing design.

The May 1990 DSEIS/R listed three basic crossing design options for further detailed review:

1. Scheme S Modified consisting of tunnels in the vicinity of North Station

acting as Storrow Drive/I–93 southbound connections with a main line bridge and viaducts for other connections;

2. Scheme T Modified consisting of tunnels under the North Station area, with a tunnel under the Charles River for connections between Storrow Drive and I–93 north;

3. Scheme Z Modified consisting of viaducts and bridges for all connections.

Alternatives 1 and 2 posed safety deficiencies resulting from the necessity for substantial lane changing maneuvers. In large part because Alternative 3—Scheme Z—was found not to present these problems, it became the recommended alternative.

The § 4(f) evaluation for the 1990 DEIS/R identified two § 4(f) resource areas in addition to those identified in the 1985 FEIS/R: a parcel of land on Nashua Street along the river adjacent to Leverett Circle and a parcel of land on the north bank of the Charles River which the MDC had acquired from the United States General Services Administration ("GSA") in 1989. It was the MDC's stated objective to extend the Esplanade along both river banks and complete the bicycle/pedestrian path. Landscaping between important park resources upstream of the Museum of Science and downstream of the North Washington Street bridge was noted, as were MHD commitments regarding open space development in the Central Artery North Area ("CANA") and its agreement to convey land on the north side of the river to the MDC when the highway projects were completed.

*November 1990:* MHD issued its 11–volume FSEIR, pursuant to requirements of MEPA.

*January 1991:* FWHA issued a 2–volume FSEIS, pursuant to NEPA.[5] A modified Scheme Z was presented in this document as the chosen Proposed Action because it was viewed as the best solution to traffic operations, more constructable, and substantially less disruptive to vehicular and commuter railroad traffic than other alternatives; and

---

**5.** At points in this Memorandum, the November 1990 and January 1991 state and federal documents are collectively referred to as the 1990–91 FSEIS/R.

because it avoided the negative construction period impacts to the Charles River and parkland associated with the river tunnel alternative.

Noting that the designation of § 4(f) properties in the May 1990 DSEIS/R had been questioned in comments suggesting that the surface of the Charles River and certain land affected by the MHD in its development of the separate but related CANA Project should have § 4(f) status, the 1991 FSEIS observed the FHWA had "engaged in extensive coordination with the 4(f) agencies with jurisdiction over" Charles River resources and took note of a November 9, 1990 letter from MDC Commissioner Bhatti regarding the designation of the Charles River and a letter of agreement on the same date between the MDC and the MHD regarding the CANA lands. With respect to the Charles River, Commissioner Bhatti distinguished between the river upstream of the railroad bridge which "the MDC has designated ... for park and recreational purposes" and "the portion of the Charles River surface located downstream of the railroad bridge in this multiple use area [where] the MDC recognize[d] ... the primary use of the water surface itself ... will not be recreational." As to the CANA property, the 1991 FSEIS observed that the primary use would be for transportation purposes and was, in any event, coupled with related mitigation and development plans for which "[n]o one has identified [other] measures ... which would be required to minimize harm to" designated § 4(f) resources.

*January 2, 1991:* The Secretary of the EOEA issued a Certificate approving the 1990–91 FSEIS/R. The Certificate called for the establishment of an advisory Bridge Design Review Committee ("BDRC") to identify further improvements to Scheme Z.

*February 1991:* EOTC established the BDRC, consisting of representatives from community groups, environmental organizations, business groups, and others, but not including the FHWA, which nevertheless announced support for the design review effort.

*May 10, 1991:* The FHWA approved the 1990–91 FSEIS/R in a Record of Decision ("ROD").

*1991 to 1992:* The BDRC analyzed more than 20 alternative designs which the committee narrowed to three options. One of the three alternatives included Committee Improvement Proposal ("CIP") 8.1 which had a two-lane tunnel under the Charles River for traffic from Storrow Drive to the Tobin Bridge and I–93 northbound. The MHD then undertook further development of CIP 8.1.

*September 1992:* The MHD filed with the EOEA a Notice of Project Change for the Charles River Crossing, pursuant to MEPA. The crossing design selected was a refinement of CIP 8.1, denominated CIP 8.1D Mod 5.

*November 1992:* The FHWA published a Notice of Intent to issue a SEIS for the Charles River Crossing.

*November to December 1992:* The MHD and the FHWA held scoping sessions for the project. The Army Corps of Engineers ("ACOE") submitted comments asking MHD and FHWA to investigate options that would have fewer temporary and permanent impacts to water and wetland resources than CIP 8.1D Mod. 5. Moreover, the FWHA expressed concern regarding the operational safety of the proposal because of several sharp curves and rapid changes in elevation which could lead to driver disorientation. As a result, a revised Scope of Work for the DSEIS/R was prepared; it required comparison of a non-river tunnel alternative with a reduced-river tunnel alternative.

*July 1993:* A DSEIS/R was published. It included three new design alternatives and compared them to Scheme Z:

1. Alternative 8.1D Mod 5 included a ten-lane mainline bridge over the Charles River and a single loop ramp in East Cambridge. A tunnel under the river would take eastbound Storrow Drive traffic to I–93 north and Route 1 north (Tobin Bridge), and also take I–93 northbound traffic to Route 1 north.

 The DSEIS/R noted that this alternative had 10,000 feet of tunnel with many severe curves and multiple points where a driver would have to make decisions

about where to go. It was projected to have the highest accident rate of the four alternatives being compared.

2. The Reduced–River Tunnel ("RRT") alternative was similar to 8.1D Mod 5, except that it took the I–93 traffic northbound to the Tobin Bridge out of the tunnel and instead created a viaduct structure; two lanes were added to the mainline bridge and two loop ramps merged into one in North Cambridge.

The DSEIS/R noted that this design eliminated the circuitous tunnel route that prompted much of FHWA's concern with 8.1D Mod 5, but observed this option still had a tunnel from Storrow Drive eastbound to I–93 north and the Tobin Bridge and consequently had a projected accident rate which, while lower than 8.1D Mod 5 was still higher than the NRT.

3. The NRT alternative eliminated the tunnel under the Charles River. Traffic from Storrow Drive to the north would cross the river on a second four-lane bridge upstream and parallel to the mainline bridge and three loop ramps would reduce to two in North Cambridge.

The DSEIS/R found that this design was better than Scheme Z because it used a land tunnel for the connections between Storrow Drive and I–93 southbound, as did 8.1D Mod 5 and the RRT, thus it "eliminate[d] the much-criticized double river crossing aspect of Scheme Z, and it reduce[d] the number and height of loop ramps on the north bank of the Charles River." The MHD also contended this design had a "striking long-span cable stayed mainline bridge of 'signature' quality that contrast[ed] sharply with the much-criticized Scheme Z bridge structure." The NRT was found to have the lowest projected accident rate of the three alternatives presented to Scheme Z.

*February 1994:* The MHD and the FHWA issued a Final SEIS/R.[6] The document chose the NRT as the preferred alternative. It concluded that the "relative impacts and benefits of the three new design alternatives are not so significantly different so as to indicate an obvious choice based on environmental impact only." However, the NRT was found to provide the "best resolution of traffic operations and safety issues."

The FSEIS/R noted that the NRT was the least expensive alternative to Scheme Z. the costs of the four alternatives were identified as:

8.1D Mod 5 = $1,282 million;

RRT = $1,131 million;

NRT = $995 million;

Scheme Z = $489 million.

The FSEIS/R also found that the tunnelling required by 8.1D Mod 5 and RRT would cause significant disruption to the river during construction, with the potential for adverse effects on water quality and a prolonged construction phase.

The FSEIS/R considered other modifications to 8.1D Mod 5, including the redesign of the Leverett Circle area, but found that redesign would still have the negative aspects of long, curving tunnels and multiple merge decision points. This refinement would have also required acquisition of a portion of the Nashua Street parcel specifically designated as a protected § 4(f) parkland resource.

The December 1993 FSEIS/R, in response to comments, considered relocating the river tunnel to a location downstream of the railroad bridge. Comments from the City of Cambridge ("Cambridge") in particular suggested expanding a realigned tunnel to include traffic from I–93 southbound to Storrow Drive, making it a two-way tunnel and thus decreasing the width of the mainline bridge. The FSEIS/R acknowledged that this Realigned Reduced–River Tunnel ("R–RRT") alternative would eliminate some of the problems associated with the "unrefined" RRT and would move construction impacts

---

6. Although this set of documents was not actually approved for issuance until February of 1994, all of the document covers state a date of publication of December 1993. I have chosen, in this Memorandum, to refer to these documents by the date listed on the covers, December 1993 FSEIS/R.

out of the recreational segment of the Charles River to the transportation corridor, but concluded that the refinement would generate circuitous use of local street intersections and would also produce negative impacts on parkland and historic resources. Other identified problems with the refined tunnel relocation proposed by Cambridge included severe temporary adverse impacts on the aquatic resources of the Charles River due to construction; possible interference with the flood control pumps at the Charles River Dam; possible construction problems with alignment of the proposed North Station/South Station rail link and the MBTA Orange Line tunnel, and an increase of two years in construction time.

The December 1993 FSEIS/R expressly considered the impacts of the four design alternatives on the § 4(f) resources formally identified by the MDC. It concluded that the NRT, RRT, and 8.1D Mod 5 all had fewer impacts to parklands in comparison with impacts from Scheme Z.

> Based on the functional equivalency of the new alternatives, their substantial similarity in proximity and other permanent impacts, and their expansion of Paul Revere Landing Park, the construction impacts of the Reduced River Tunnel Alternative and Alternative 8.1D Mod 5, and the latter alternative's greater traffic congestion next to the Esplanade, the Preferred [NRT] Alternative minimizes harm to parklands compared to these alternatives. The refined version of the Reduced River Tunnel Alternative is very similar to the Preferred Alternative as it affects 4(f) Parklands, and does not reduce harm to a greater degree.

December 1993 FSEIS/R, Part I, Final Section 4(f) Evaluation, at 17–18.

7. Count I alleges shortcomings by the BDRC; Counts II through VIII allege violations of § 4(f) and of NEPA. The complaint also seeks an injunction prohibiting the MHD from taking any action regarding the Charles River Crossing "until such time as the requirements of NEPA and Section 4(f) have been satisfied." (Complaint at ¶ 48.) I refer to this complaint as the Geer Complaint, after the first-named plaintiff.

8. Counts I through IX allege violations of § 4(f) and Counts X through XVI allege violations of

The Appendix to the Section 4(f) Evaluation in the December 1993 FSEIS/R included a letter dated December 30, 1993 from Ilyas Bhatti, MDC Commissioner, to Peter Zuk, the Project Director for the CA/T project, in which the MDC reaffirmed the § 4(f) designations in its November 9, 1990 letter, noting that "there have been no changed circumstances that would necessitate any alteration in park designation in the New Charles River Basin portion of the MDC's Charles River Reservation, as outlined in my letter ... dated November 9, 1990." December 1993 FSEIS/R, Part I, Final Section 4(f) Evaluation, App. 2, at 1.

*March 18, 1994:* EOEA issued a Certificate for the FSEIS/R.

*June 9, 1994:* FHWA issued its ROD approving the NRT as the Preferred Alternative.

## II.

### PROCEDURAL POSTURE

Consolidated before me are two actions that challenge the process and substance of the decision-making through which various state and federal agencies selected the design of the Central Artery roads and highways that will cross the Charles River. In January 1995, forty-four individual plaintiffs and three organizations brought an eight-count complaint (the "Geer Complaint")[7] against the FHA, the MHD, and their administrators. In March 1995, Cambridge brought a sixteen-count[8] complaint against the FHA, the Governor of Massachusetts, the Massachusetts Secretary of Transportation and Construction, the MHD, the MDC, and their administrators.

All parties have moved for summary judgment. This Memorandum will detail resolution of the motions for summary judgment.[9]

NEPA. Cambridge also seeks declaratory and injunctive relief.

9. Several additional motions are also pending including those of Cambridge for consideration of additional evidence and of the plaintiffs in both actions for a preliminary injunction. Detailed resolution of the motions to consider additional evidence is set forth in a separate memorandum. Because I resolve this case adversely to plaintiffs through summary judgment, the motions for preliminary injunction are moot.

## III.

## STANDARD OF REVIEW

The agency action at issue here is reviewable under the Administrative Procedure Act ("APA"). *Sierra Club v. Penfold,* 857 F.2d 1307, 1315 (9th Cir.1988). The agency action may not be overturned unless it is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Conservation Law Foundation v. Federal Highway Admin.,* 24 F.3d 1465, 1471 (1st Cir.1994); 5 U.S.C. § 706(2)(A). A reviewing court must conduct a searching and careful inquiry into whether the agencies' decisions were based upon the relevant factors. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971). But the court must not simply substitute its own judgment for that of the agencies. *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983); *Adams v. United States Environmental Protection Agency,* 38 F.3d 43, 49 (1st Cir.1994) (citations omitted).

Because review of the administrative record here takes place in summary judgment motion practice, if I find "the agency's determination procedurally adequate, summary judgment in [the agency's] favor [is] appropriate unless [the non-moving party has] raised a genuine issue of material fact as to whether its substantive decision was arbitrary and capricious or an abuse of discretion." *Concerned Citizens on I–190 v. Secretary of Transportation,* 641 F.2d 1, 7 (1st Cir.1981). *See generally, Citizens for the Scenic Severn River Bridge, Inc. v. Skinner,* 802 F.Supp. 1325, 1332 (D.Md.1991), *aff'd,* 972 F.2d 338 (4th Cir.1992).

### A. *Summary Judgment and Agency Review*

The First Circuit has elaborated the standards for evaluating a summary judgment motion in connection with judicial review of agency actions. In *Commonwealth of Massachusetts v. Secretary of Agric.,* 984 F.2d 514 (1st Cir.), *cert. denied,* 510 U.S. 822, 114 S.Ct. 81, 126 L.Ed.2d 49 (1993), the court *en banc* observed that the "idiosyncratic nature

of summary judgment practice," requiring the court to indulge all reasonable inferences in favor of the non-moving party, leads to a "slightly different twist to the operation of the familiar 'arbitrary-and-capricious' standard." *Id.* at 525. The court held:

> [T]he real question is not whether the facts [can establish some dispute], but rather, whether the administrative record, now closed, reflects a sufficient dispute concerning the factual predicate on which [the agency] relied ... to support a finding that the agency acted arbitrarily or capriciously.

*Id.*

### B. *NEPA Evaluation*

NEPA embodies "twin aims: to ensure that the agency takes a 'hard look' at the environmental consequences of its proposed action, and to make information on the environmental consequences available to the public," *Dubois v. United States Dep't of Agriculture,* 102 F.3d 1273, 1285 (1st Cir.1996), *cert. denied sub nom., Loon Mountain Recreation Corp. v. Dubois,* — U.S. —, 117 S.Ct. 2510, 138 L.Ed.2d 1013, 1997 WL 155449 (June 27, 1997), (citing *Robertson,* 490 U.S. at 350, 109 S.Ct. at 1845–46), NEPA "seeks to create a particular bureaucratic decision making process, a process whereby administrators make important decisions with an informed awareness of how the decision might significantly affect the environment." *Sierra Club v. Marsh,* 872 F.2d 497, 497 (1st Cir.1989) (Breyer, J.); *see also Andrus v. Sierra Club,* 442 U.S. 347, 349–52, 99 S.Ct. 2335, 2336–38, 60 L.Ed.2d 943 (1979).

NEPA review is narrow in scope. *Strycker's Bay Neighborhood Council v. Karlen,* 444 U.S. 223, 227, 100 S.Ct. 497, 499–500, 62 L.Ed.2d 433 (1980) (per curiam). The issue is not whether the agency's decision is "ideal", *State of Louisiana ex rel. Guste v. Verity,* 853 F.2d 322, 327 (5th Cir.1988), or even the "best", *City of Stoughton v. United States Environmental Protection Agency,* 858 F.2d 747, 756 (D.C.Cir.1988), but rather " 'whether the decision was based on a consideration of the relevant factors and whether there was a clear error of judgment.' " *Motor Vehicle Manufacturers Assn,* 463 U.S.

at 43, 103 S.Ct. at 2866 (citations omitted). The reviewing court in making this analysis is seeking to "assure itself that the agency has given good faith consideration to the environmental consequences of its actions and should not pass judgment on the balance struck by the agency among competing concerns." *Grazing Fields v. Goldschmidt,* 626 F.2d 1068, 1072 (1st Cir.1980).

### C. *Section 4(f) Evaluation*

In contrast to the broad concerns of NEPA with procedures to ensure environmentally informed decision making, § 4(f) narrows the focus rigorously to the substantive goal of protecting parkland.

The requirements of § 4(f) are "stringent." *Stop H–3 Ass'n v. Dole,* 740 F.2d 1442, 1447 (9th Cir.1984), *cert. denied,* 471 U.S. 1108, 105 S.Ct. 2344, 85 L.Ed.2d 859 (1985). The language of the statute is a "plain and explicit bar to the use of federal funds for construction of highways through parks—only the most unusual situations are exempted." *Overton Park,* 401 U.S. at 411, 91 S.Ct. at 821.

The plaintiffs concede that there is no prudent and feasible alternative to using the various parklands located at or near the Charles River Crossing site. Thus, their challenge is not mounted under § 4(f)(1). They contend instead that the defendants' actions violate the requirement in § 4(f)(2) to minimize harm to public parks. *Id.* Thus, the issue here is whether the FHWA acted in a way "that its regulations did not contemplate, or without considering [the MDC's position], or in reliance on a manifestly inadequate factual showing." *Mass. v. Secretary of Agric.,* 984 F.2d at 526.

## IV.

### DID FHWA COMPLY WITH NEPA?

The plaintiffs have framed six issues within the NEPA prong of their challenge to defendants' choice of the NRT alternative. Three of these issues—alleged failures to describe the existing environment adequately, to consider environmental impacts adequately and to consult with the MDC—are so bound up in the § 4(f) prong of the plaintiffs' challenge that they are more intelligibly considered in

the following section regarding § 4(f), where the pivotal point is the propriety of the FHWA and MDC delineation of the parkland environment. I take up in this section the three issues the plaintiffs have framed which stand alone as NEPA concerns.

### A. *Was There A Failure to Consider All Alternatives?*

■ The plaintiffs allege that the December 1993 FSEIS/R failed to evaluate all alternatives objectively, but instead focused only upon a comparative evaluation of Scheme Z and the NRT. Cambridge Mem. Opp.Mot.Summ.J. ("Cambridge Memo.") at 85; Geer Mem.Opp.Mot.Summ.J. ("Geer Memo.") at 49. The plaintiffs argue the defendants should have given more focus to tunnel alternatives, in particular the R–RRT alternative. *Id.*

■ Examination of the documents compiled by the agencies demonstrates that the defendants exhaustively evaluated the impacts of the final alternatives: Scheme Z, 8.1D Mod 5, the NRT, the RRT, and the R–RRT. Furthermore, throughout the history of this project, the MHD examined a vast array of alternatives. *See* November 1990 FSEIR, Part II, Analysis of Alternative Design Options at IIB 1–6 (listing over 100 various alternatives that were considered at one time or another). An agency is not required to study every possible alternative. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 552, 98 S.Ct. 1197, 1216, 55 L.Ed.2d 460 (1978). "Common sense also teaches us that the 'detailed statement of alternatives' cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man." *Id.* It is enough that the defendants here considered the alternatives that they did in the way that they did.

The plaintiffs' desire to have the R–RRT alternative explored in yet greater detail contravenes the proper deference that the court must give to the technical decisions made by the agencies. "It is of course always possible to explore a subject more deeply and to discuss it more thoroughly," *Coalition on Sensible Transp., Inc. v. Dole,* 826 F.2d 60,

66 (D.C.Cir.1987), but it is the proper role of the agencies to determine where to draw the line. *Id.* Here, I note that record discloses a number of difficulties posed by the R–RRT alternative. These include the problems of blasting in the Charles River; aquatic impacts; hydraulic impacts; construction impacts; problems in coordinating construction with other aspects of the Charles River Crossing and Central Artery Project; problems relating to the proximity to the Orange Line tunnel; and additional length of construction time. December 1993 FSEIS/R, Part I, Preferred Alternative at 2–19–20. Given this record detailing the problems with the R–RRT alternative, I am satisfied that the decision of the agencies not to pursue this alternative further was neither arbitrary nor capricious.

■ The plaintiffs also contend that the 1993 DSEIS/R indicates, in some respects, that the 8.1D Mod. 5 and the RRT alternatives are superior to the NRT. Cambridge Memo. at 89. I note that under NEPA it is the responsibility of the agency, not the courts, to weigh the conflicting opinions that may appear in a report. *Valley Citizens for a Safe Environment v. Aldridge,* 886 F.2d 458, 460 (1st Cir.1989). I find that all alternatives were adequately considered before the defendants made their decision.

### B. *Was There a Failure to Respond to Significant Comments?*

■ The plaintiffs also allege that the December 1993 FSEIS/R violates NEPA because it fails to provide adequate responses to comments made earlier on the DSEIS/R. Cambridge Complaint, ¶¶ 164–166. Although

Cambridge's Complaint does not specify with particularity which of the literally hundreds of comment letters that appear in the record the FHWA's response was inadequate, I gather from the Cambridge Memo. that four in particular are alleged to be problematic. These include responses to: an October 4, 1993 Memorandum from the Massachusetts Coastal Zone Management ("MCZM"") program, December 1993 FSEIS/R, Part II at S–7 (10/4/93 Memorandum from the MCZM); an October 5, 1993 letter from the DEP, December 1993 FSEIS/R, Part II at S–8 (10/5/93 Letter from DEP); an October 5, 1993 letter from the EPA, December 1993 FSEIS/R, Part II at F–2 (10/5/93 Letter from EPA); and an October 5, 1993 letter from the Cambridge Conservation Commission ("CCC"), December 1993 FSEIS/R, Part II at L–5 (10/5/93 Letter from CCC).

Cambridge alleges that, for the first three comment letters, the inadequate responses are those that relate to the impact of tunneling on aquatic resources for any of the proposed alternatives that include tunnel(s) between Storrow Drive and Cambridge. Cambridge Memo. at 57–58. Together, the MCZM Memorandum and DEP and EPA letters state, in varying ways, that although tunneling will have "greater"[10] impact on water quality than the NRT alternative,[11] these impacts will only be temporary during the construction period and that construction techniques are available to lessen the impacts.[12] *Id.; see also id.* at 98. The CCC letter similarly states that the FHWA wrongly balances short-term construction impacts associated with tunneling. 10/5/93 Letter from CCC. Cambridge claims that

---

**10.** 10/4/93 Memorandum from the MCZM Program (stating that contaminants have been found in the Charles River sediment and that "[c]learly the reduced river tunnel alternative will have greater impacts on water quality due to the greater amount of construction in the water, however MCZM believes that there are adequate sediment control techniques available to make this a relatively insignificant factor in the evaluation of alternatives").

**11.** 10/5/93 Letter from DEP (stating that "[f]rom a purely theoretical perspective, the Non–River–tunnel alternative would be expected to have the least potential for adverse impacts to surface waters in the project area due to the fact that it

minimizes construction activities in or adjacent to surface water bodies").

**12.** 10/5/93 Letter from EPA (stating that the areas "affected by tunnel construction could be fully restored by replacement of clean substrate over the tunnel box and replacement of the granite seawall after cofferdam construction is complete. Since the additional aquatic impacts associated with tunnel construction in the Charles and Millers Rivers would be temporary during the construction period only, and the environment could be fully restored after construction, the mere presence of these additional temporary impacts does not eliminate these alternatives").

FHWA's responses to these comments were non-existent in the EPA's case [13] and consisted only of an inadequate "[c]omment noted" in the cases of the MCZM, DEP, and the CCC.[14] Cambridge Memo. at 98–99.

Upon a close examination of the record, I do not find the FHWA responses to these, or any other, comment letters to be inadequate or otherwise arbitrary and capricious. As several of the commentors noted, all of the tunnel alternatives will result in construction impacts. The MCZM memorandum itself notes that contaminated sediment is likely to be an impact associated with tunnel construction. 10/4/93 Memorandum from the MCZM. This area of comment was considered fully in the larger discussion of alternatives where the FHWA weighed the competing short-term impacts and long-term prospects of the several alternatives before making its choice of the Preferred Alternative.

 NEPA does not require that an agency choose the alternative that some of the commentors—or even the court—might believe is best. *Strycker's Bay*, 444 U.S. at 227–28, 100 S.Ct. at 499–500; *Grazing Fields*, 626 F.2d at 1072. It is the agency's responsibility to determine how to weigh each of a project's impacts. *Robertson*, 490 U.S. at 350–51, 109 S.Ct. at 1846 (holding that "[i]f the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs"). It is

settled that "once an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.'" *Strycker's Bay*, 444 U.S. at 227–28, 100 S.Ct. at 499–500 (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410, n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976)). Here, where the FHWA plainly considered the impacts for the various alternatives, it was not arbitrary and capricious for the FHWA to have decided that the benefits of the Preferred Alternative outweighed the impacts associated with the tunnel alternatives. I find no failure to respond to significant comments in the December 1993 FSEIS/R read as a whole.

### C. Was There Inappropriate Decision-making Outside of the NEPA Process?

 In Count XV of its complaint, Cambridge alleges that the defendants engaged in unlawful decision-making regarding the project prior to the completion of the NEPA process. This unlawful decision-making is said to be reflected in two documents that provide mitigation for the CA/T Project without NEPA review. These are: (1) a document entitled the "Massachusetts Transportation Agenda" which the EOTC adopted as agency policy [15] on September 27,

---

13. EPA's comment was addressed specifically. The FHWA's response to the EPA's comment notes:

> In its comment letter, the EPA expressed a concern about an additional 1.5 acres of marine construction for the tunnel. Because marine tunnel construction is no longer part of the proposed crossing, the cumulative impact of bridge and tunnel construction on navigation in the Charles is no longer an issue. Specific mitigation for impacts to navigation from construction of the two bridges is discussed in Chapter 5.

December 1993 FSEIS/R, Part II at F–2, p. 3 (FHWA Response to October 5, 1993 Letter from EPA).

14. In addition to "[c]omment noted", the FHWA response also states "[s]ee previous responses

which illustrate the adequacy of the SEIS/R analysis." (December 1993 FSEIS/R, Part II at L–5, p. 15 (FHWA Response to October 5, 1993 Letter from CCC); *see also* Cambridge Memo. at 99.)

15. Page 7 of the document states "Adopted as Policy by the Executive Office of Transportation and Development as of September 27, 1990" and is signed by Frederick Salvucci, Secretary. (January 1991 FSEIS, App. 4 at 7.) The next page also contains the following: "September 27, 1990 The Massachusetts Executive Office of Environmental Affairs, acting by and through the undersigned Secretary of Environmental Affairs, endorses the Massachusetts Transportation Agenda adopted today by the Massachusetts Executive Office of Transportation and Construction." *Id.* at 8. This page is signed by John DeVillars, Secretary of Massachusetts EOEA. *Id.*

1990 [16] and which was included in the January 1991 FSEIS,[17] Cambridge Complaint at ¶ 174; *see also* January 1991 FSEIS, App. 4, September 27, 1990 Massachusetts Transportation Agenda; and (2) a Memorandum of Understanding among the EOTC, the MHD, and CLF entitled "Traffic and Air Quality Mitigation for the Central Artery/Third Harbor Tunnel Project." Cambridge Complaint at ¶ 175; *see also* January 1991 FSEIS, App. 2, December 19, 1990 Memorandum of Understanding. The Memorandum of Understanding commits the EOTC and MHD to extensive transportation mitigation measures, including mass transit improvements, freezes on highway construction, increased high occupancy vehicle lanes in the region, and other measures. *Id.* Cambridge alleges that these documents were prepared without public notice or opportunity to comment, and therefore were not subject to any actions satisfying NEPA's procedural requirements. Cambridge Complaint at ¶¶ 176–81. Specifically, the plaintiffs allege that the FHWA did not satisfy NEPA because the "three [18] agreements provide 'mitigation', as that term is defined by NEPA; second, because FHWA plainly relied upon the mitigation agreements; and third, because NEPA regulations required EOTC and MHD to adhere to the NEPA process." Cambridge Memo. at 101.

The defendants respond, however, that these documents are an acknowledgment of state, not federal, commitments and thus were not subject to the NEPA process. Def's. Joint Reply Mem. at 68–69. The defendants point to the FHWA's ROD on May 10, 1991 which they contend demonstrates that FHWA "expressly *declines* to incorporate" the commitments evidenced by the two documents. *Id.* at 69 (emphasis in original).

The May 1991 ROD contains the following language:

A number of comments ... support the program of mass transit and transportation demand reduction measures adopted by the State in the FSEIS/R and related State environmental review documentation. These comments emphatically view the implementation of these commitments as necessary to achieve Federal and State environmental goals of reducing traffic congestion and improving air quality, and they accordingly urge that these commitments be incorporated by FHWA into this ROD.... In response to these comments, this ROD recognizes these public transportation improvement commitments by the State.... These commitments are not necessarily project related, but we intend that their inclusion in the ROD be to recognize the authority of the State to enter into them, as well as the affirmative, ongoing obligation of the State to fulfill the commitments. *Although the commitments are included in the FSEIS appendices and referred to in this ROD, they reflect the understanding of the parties involved and are not Federal commitments.*

A.R. Doc. 2 at 28 (5/10/91 FHWA ROD) (emphasis added). In addition, FHWA's June 1994 ROD states that the mitigation measures for "transportation, land use, air quality, noise and vibration, navigation, historic and archaeological resources, and visual impacts" as found in Section 6.2.1 of the December 1993 FSEIS/R are simply incorporated by reference. A.R. Doc. 3 at 16 (June 1994 FHWA ROD).

Moreover, a close examination of the December 1993 FSEIS/R reveals that FHWA did *not* rely on the transportation mitigation measures referenced in either the Massachusetts Transportation Agenda or the December 19, 1990 Memorandum of Understanding. *See* December 1993 FSEIS/R, Part I, §§ 4.1.10 and 6.2.1. These two sections identify the transportation mitigation measures

---

**16.** The document was prepared by an organization named "1000 Friends of Massachusetts." The record does not disclose the identity of the members of this organization.

**17.** The Complaint mistakenly refers to the location of this document in the record as the "1990 FSEIS/R". (*See* Cambridge Complaint ¶ 174.)

**18.** "Three" appears to be a typographic error. Cambridge's Complaint and Memo. specify only two agreements which it alleges were adopted outside of the NEPA process: the Massachusetts Transportation Agenda and the Memorandum of Understanding between EOTC/MHD/CLF. *See* Cambridge Memo. at 100–03.

for the Charles River Crossing as including a Rutherford Avenue Corridor Study, replacement parking at the MBTA's North Station parking garage, pedestrian paths and bikeways, high occupancy vehicle lanes on I-93 north of the Charles River, and several intersection improvements.[19] *Id.* I do not find in the December 1993 FSEIS/R any of the mitigation measures listed in the two documents which Cambridge claims the FHWA relied upon. *Compare id. with* January 1991 FSEIS, App. 2 (12/19/90 Memorandum of Understanding) and January 1991 FSEIS, App. 4 (9/27/90 Massachusetts Transportation Agenda). The mitigation measures in the two documents include parking freezes, priority treatment for van and car pools, commuter rail and mass transit improvements (listed in Appendix A of the Memorandum of Understanding), indexing of MBTA fares, expanded water shuttle services, a freeze on expansion of radial roadways within the Route 128 belt, increased high-occupancy vehicle lane use on various roadways including I-93 North and South, the Southeast Expressway, and the Massachusetts Turnpike, and a second major airport. *Id.* None of these mitigation measures appear in the December 1993 FSEIS/R.[20] They are apparently neither "federally funded nor significantly bound up in a federally funded project" sufficiently to be considered a federal action required to be addressed under NEPA. *Citizens for Responsible Area Growth v. Adams,* 680 F.2d 835, 839 (1st Cir.1982).

**D. *Conclusion***

The FHWA throughout a twelve year environmental review process evaluated and addressed the numerous environmental issues raised. In addition, the FHWA considered a vast array of alternatives. The FHWA also solicited comments on its reports and responded to them in their final reports. It evaluated the various comments within the broad analysis of alternatives. And while the FHWA noted as part of the larger context various state initiatives and commitments, there was no decision-making undertaken or relied upon *by the FHWA* outside the NEPA process. My review of these aspects of plaintiffs' challenge compels me to conclude that the FHWA did not act in an arbitrary or capricious manner under NEPA and that the FHWA's actions were procedurally adequate.

**V.**

**DID FHWA COMPLY WITH SECTION 4(f)?**

The plaintiffs press five basic but overlapping issues in the § 4(f) prong of their challenge to defendants' choice of the NRT alternative. At the threshold are two § 4(f) issues, whether there was: a) failure to follow appropriate procedures for identification of protected resources, with consequent b) failure properly to identify all areas protected by § 4(f). These threshold issues also comprehend the issues of failure to describe the existing environment adequately and failure to consult the MDC appropriately, which were framed as NEPA concerns. The remaining § 4(f) issues—whether there is constructive use of § 4(f) resources; whether harms to protected resources have been minimized and whether the defendants are adequately committed to mitigation—cannot be examined in a meaningful fashion until the threshold issues concerning identification of § 4(f) resources are resolved. Accordingly, after outlining the general principles governing § 4(f) controversies, I turn initially to those issues.

---

**19.** These intersection improvements are called "geometric modifications" to Leverett Circle, New Sudbury/Cross Streets, Charles Circle, Keany Square, and Sullivan Square. December 1993 FSEIS/R, Part I at 6-5.

**20.** An exception is the use of high occupancy vehicle lanes. The December 1993 FSEIS/R states:

> **HOV Facilities.** MHD will implement a northward extension of the existing southbound HOV lane on I-93 north of the Charles River as a short-range measure. A contraflow HOV lane northward toward Route 128 is currently proposed upon completion of the Charles River Crossing.

December 1993 FSEIS/R, Part I at 4-15. I do not consider this one overlap to be significant, given the large numbers of transportation measures listed in the Memorandum of Understanding and Massachusetts Transportation Agenda.

The Supreme Court in *Overton Park,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136, outlined how courts should review decisions under § 4(f). The Court identified three factors for consideration. *Conservation Law Foundation v. Federal Highway Administration,* 827 F.Supp. 871, 882 (D.R.I.1993), *aff'd,* 24 F.3d 1465 (1st Cir.1994). The reviewing court must determine whether the Secretary of Transportation[21] acted within the scope of his or her authority by deciding whether or not the Secretary could reasonably have believed that there were no prudent or feasible alternatives to the chosen project. *Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823–24. Because plaintiffs concede there is no prudent or feasible alternative in this case, this issue is not before me here. The court must also determine whether the Secretary followed all of the procedural requirements under the statute. *Id.* at 417, 91 S.Ct. at 824. And the court must determine whether or not the decision was arbitrary and capricious based on whether or not "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 416, 91 S.Ct. at 824.

Before addressing the FHWA's § 4(f) review specifically in dispute in this litigation, I will provide an overview of the guidelines for § 4(f) evaluation in general.

In order for a property to qualify for protection under § 4(f) it must be (a) a public park that is (b) of national, state or local significance (as determined by the officials having jurisdiction over the park). 49 U.S.C. § 303(c). The FHWA reviews the state determination of significance of a public park for reasonableness. *Concerned Citizens on I–190 v. Secretary of Transportation,* 641 F.2d 1, 7 (1st Cir.1981).

The first step in the process is to identify § 4(f) resources. The FHWA's "Section 4(f) Policy Paper," *see* Tab 1 to Cambridge Appendix ("Policy Paper""), addresses approaches for identifying § 4(f) resources. The Policy Paper states that "it is essential

that the following are completely documented: (a) the applicability/nonapplicability of Section 4(f); (2) the coordination efforts with the official(s) having jurisdiction over or administering the land (relative to significance of the land, primary use of the land, mitigation measures, etc.); (3) the location and design alternatives that would avoid or minimize harm to the Section 4(f) land; and (4) all measures to minimize harm, such as design and landscaping." *Id.* at 3.

Once the FHWA determines that a project will use protected § 4(f) land, a § 4(f) evaluation must be prepared. *Id.* Section 4(f)(1) requires that, if possible, the project avoid use of protected resources at all. The plaintiffs acknowledge that because all of the alternative designs for the CA/T Project require use of protected resources, there is no "feasible and prudent" alternative and that the FHWA has complied with the directives of § 4(f)(1)."

If all of the alternatives use § 4(f) resources, the "alternative which has the least overall impact to Section 4(f) resources must be selected unless it is not feasible and prudent."" Policy Paper at 5.

The FHWA must integrate all possible planning to minimize harm to protected park lands, through consultation with the local official or agency which owns or administers the land. *Id.* at 5.

Throughout this process and prior to the circulation of the draft § 4(f) evaluation, the FHWA should coordinate with the official or agency administering the land, as well as relevant federal officials. *Id.* at 6.

In this case, the agency administering the land was the MDC. Two formal MDC communications to the FHWA in response to draft FSEIS/R § 4(f) determinations dealt with the resources at issue here, which the plaintiffs contend are within the scope of § 4(f).

In the November 9, 1990 letter to FHWA Regional Administrator Anthony Fusco, the MDC's Bhatti stated, on behalf of the MDC,

---

**21.** The statute and much of the case law refer to decisions of the Secretary of the Department of Transportation. Here, the FHWA made the disputed decisions, which are attributable to the

Secretary because the FHWA is the Secretary's designee. Consequently, references to the "Secretary" or the "Secretary's decision" also apply to the FHWA in this case.

that "the MDC has designated the portion of the Basin extension river surface area upstream of the railroad bridge for park and recreational purposes."" 11/9/90 Letter, December 1993 FSEIS/R, Part I, Final Section 4(f) Evaluation, App. 3, Ex. A, at 2. In connection with the New Basin, the letter stated that:

> With respect to the portion of the Charles River surface located downstream of the railroad bridge in this multiple use area, the MDC recognizes that the potential for similar recreational uses is not present. This portion of the River is constrained in useable width ... Moreover a significant portion of the water surface near the north bank of Paul Revere Landing Park is restricted from use and is inappropriate for small boats.... Although boat passage through this area is permitted, this is not a suitable location for active recreational boating and none currently exists there today due to these conditions. The downstream river area is also partially bordered by lands which are under the ownership of the transportation agencies, including the MBTA and the Department of Public Works.
>
> MDC plans for use of this downstream river portion of the Basin extension include continuation of its existing navigation, flood control, and associated water management functions, along with transportation purposes, as the primary passageway for recreational boats traveling to the park areas upstream ... While this navigational function is supportive of recreational uses, the primary use of the water surface itself downstream of the railroad bridge will not be recreational.

*Id.*

The December 30, 1993 letter from Bhatti to CA/T Project Director Zuk reaffirmed

these § 4(f) characterizations. 12/30/93 Letter, December 1993 FSEIS/R, Part I, Final Section 4(f) Evaluation, App. 2, at 1. The letter noted that "there have been no changed circumstances that would necessitate any alteration in park designations in the New Charles River Basin portion of the Charles River Reservation, as outlined in my letter ... dated November 9, 1990." *Id.*

## A. Was There a Failure to Follow Appropriate Procedures for Identification of Protected Resources?

 The plaintiffs allege that the MHD violated procedural mandates by bargaining for changes in § 4(f) designations in order to allow the project to move forward. Cambridge claims that if the November 9, 1990 MDC letter is viewed as altering the § 4(f) status of the New Charles River Basin[22] to non-protected resource then the FHWA bargained with the MDC to exchange a § 4(f) designation for additional mitigation. This bargaining would violate § 4(f), according to the plaintiffs, because the proper procedure required under the statute requires that § 4(f) resources be identified and determined to be "used" in a particular project well before mitigation considerations are made."

 Section 4(f) requires the FHWA to obtain the MDC's position regarding park land designations and to review that decision for its reasonableness. The record before me does not indicate that the FHWA failed to do so.

The FHWA accepted comments throughout the process, in the form of various reports and letters from the MDC regarding the parcels at issue. *See e.g.,* 11/9/90 Letter, 1991 FSEIS at III–4 and Appendix 3; 12/30/93 Letter, December 1993 FSEIS/R, Part I, Section 4(f) Evaluation, Appendix 3;

**22.** The area in dispute which I refer to throughout this Memorandum as the New Charles River Basin or the New Basin covers the river surface between the MBTA railroad bridge and the New Charles River Dam. Throughout the record there are a number of references to this area as the Lower Basin. According to a 1993 letter from Julia O'Brien of the MDC to Robert Albee of the CA/T Project, the MDC uses the term "Lower Basin" to refer to the area from the Cottage Farm Bridge to the old dam and the term "New Basin" to refer to the area between the old dam and the new dam. A.R.Doc. 447. In response, Albee stated that the CA/T Project would adopt the MDC nomenclature for the river designations. A.R.Doc. 448. For the purposes of this Memorandum, I will refer to these areas along the surface of the Charles River using the MDC terms, recognizing that it is only a portion of the New Basin watersheet that is actually in dispute as a § 4(f) resource.

Master Plan, A.R.Doc. 414; A.R.Doc. 425. Based on a review of these documents, as well as the various state legislation connected with the lands and the ways in which the properties had been and were being utilized, it is apparent the FHWA determined that the MDC had not ever made a formal designation of the relevant portion of the New Charles River Basin or the other parcels in dispute as § 4(f) resources and the FHWA treated this lack of designation as reasonable.

■ The plaintiffs also contend that the FHWA failed to consult with the MDC adequately as required under § 4(f). Cambridge argues that the EOEA prevented the MDC from commenting on the 1991 FSEIS/R and submits an April 8, 1991 internal MDC memorandum with a draft comment to the FHWA dated the same day as proof that the MDC was denied the opportunity to comment. While it is true that the internal MDC memorandum submitted stated that the "EOEA would forward the December comments on the FSEIR to the Federal Highway Administration and that [the EOEC told the MDC that] individual agencies were not to send separate comments," Tab 8 to Cambridge Appendix, it is not the FHWA, but the Massachusetts EOEA office which decided not to forward the draft letter on to the FHWA as comments to the FSEIR." That the EOEA decided to rely on the official December 1993 letter rather than a contradictory draft letter dated four months later does not transform FHWA's determination that the November 1990 and December 1993 letters were sufficient to allow it to review the MDC's decision into a violation of the procedural requirements of § 4(f).

The initial review of the § 4(f) process in this section is one of pure procedure. I review below in this Memorandum the substantive decisions of the FHWA throughout the CA/T Project in designating the proper § 4(f) lands and incorporating the proper measure to minimize harm and mitigate effects. My review of the plaintiff's claim that there was a failure to consult adequately rests not on a review of the substantive outcome of the process but rather on the alleged shortcomings in the process.

Although the plaintiffs point to the record as proof that the FHWA essentially traded a § 4(f) designation for greater levels of mitigation, the abundance of documentation appears to me to reflect not impropriety but rather an intense and somewhat disputatious discussion back and forth among the numerous parties, with inherent posturing on all sides. The eventual compromise and agreement involved evidence the consultation as required under the statute. Rather than indicating bad faith on the part of the FHWA or any other defendant, the record discloses numerous voices of advocates attempting to articulate as strong a position as possible for their views at various times throughout. Consultation here involved the FHWA listening to all of these voices and reconciling the sometimes conflicting messages to conduct an overall review and determination. Regardless of whether or not I agree with the final outcome of the FHWA's decision-making process, on the record before me it appears quite clear that the FHWA did not fail to follow the general procedure and process for consultation under § 4(f) regarding protected resources.

Once the FHWA determined that § 4(f) resources were at risk in the project, it reviewed the MDC's nuanced designation of various lands as parks in connection with this project. At numerous times throughout the process, § 4(f) evaluations were completed within the various draft and final EIS/Rs. The FHWA consulted with the MDC as well as other federal agencies and solicited comments to which it made appropriate responses at each step in the process. The FHWA followed the general guidelines of the Policy Paper in identifying § 4(f) resources and then addressing efforts to minimize and mitigate harms to the areas once identified.

Having found that the FHWA has not committed a violation of the procedural mandates of § 4(f), I turn now to the specific identification of the individual resources in dispute and the efforts of the FHWA to ensure proper minimization of harms.

## B. Was There a Failure to Identify All Resources Protected by § 4(f)?

■ Section 4(f) is triggered only when a project requiring the use of a protected prop-

erty seeks federal funding. Therefore, the "labeling of property as 'used' or 'not used' is the prerequisite to further examination and to compliance with the provisions of § 4(f)." *Adler v. Lewis*, 675 F.2d 1085, 1091 (9th Cir.1982). The analysis of whether or not a project uses § 4(f) lands therefore precedes the *Overton Park* review. *Id.*

Section 4(f) affords protection for land which is "publicly owned *and* designated or administered as a public park, recreational area, or wildlife or waterfowl refuge." *Ringsred v. Dole*, 828 F.2d 1300, 1304 (8th Cir. 1987) (emphasis in original); 49 U.S.C. § 303(c). Not all publicly owned lands, however, are protected by § 4(f). Two conditions must be met in order for the statute to apply: "first, ... the land must be publicly owned, and second, the land must be from one of the enumerated types of publicly owned land, i.e., a public park, recreational area, or wildlife and waterfowl refuge." *National Wildlife Federation v. Coleman*, 529 F.2d 359, 370 (5th Cir.), *cert. denied sub nom., Boteler v. National Wildlife Federation*, 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587 (1976) (citations omitted). The land "must be 'designated or administered, formally or informally' " for one of these purposes. *Mullin v. Skinner*, 756 F.Supp. 904, 924 (E.D.N.C.1990) (statute declaring lands held in public trust insufficient to create § 4(f) protection without further designation) (citations omitted).

Federal regulations implementing § 4(f) are clear in stating that while it is the federal, state or local official which has jurisdiction over a given park or recreation area to determine its significance, it is the responsibility of the FHWA to review this determination of significance for its reasonableness. 23 C.F.R. § 771.135(c); *Concerned Citizens*, 641 F.2d at 7. The Policy Paper is explicit in stating that "[t]he final decision on applicability of Section 4(f) to a particular type of land is made by FHWA." In reaching this decision, however, FHWA normally relies on the official having jurisdiction over the land to identify the kinds of activity or functions that take place." Policy Paper at 9. The designation of specific parcels as park or recreation

resource under § 4(f) is one which must be formal or explicit. *See* Policy Paper at 18.

In general, an entire parcel, which is a park or recreation area, will be presumed to be significant, unless the official having jurisdiction over it determines that the entire site is not significant. 23 C.F.R. § 771.135(c). But when a parcel is administered and managed for multiple uses, § 4(f) applies only to those portions of the parcel which

> function for, or are designated in the plans of the administering agency as being for, significant park, [or] recreation, ... purposes. The determination as to which lands so function or are so designated, and the significance of those lands, shall be made by the officials having jurisdiction over the lands. The Administration will review this determination to assure its reasonableness. The determination of significance shall apply to the entire area of such park, [or] recreation, ... sites.

23 C.F.R. § 771.135(d).

Throughout, the ultimate duty to determine § 4(f) status is in the hands of the FHWA. While the MDC, as the state agency with jurisdiction over the land, has the authority to designate certain parcels formally as § 4(f) protected resources, the FHWA reviews any designation—or by negative pregnant, any failure to designate brought to the agency's attention—for reasonableness. When there is no formal designation but some indication that such nondesignated land is being or will be used as parkland, the FHWA must determine whether the contested parcel is protected under the statute.

1. *The Area of the Charles River Between the New Charles River Dam and the MBTA Bridge (The New Charles River Basin)*

The Policy Paper states that "[i]n general, rivers are not subject to the requirements of Section 4(f).... Of course, Section 4(f) would also apply to the lakes and rivers or portions thereof which are contained within the boundaries of parks, recreational areas, refuges, and historic sites to which Section 4(f) otherwise applies." Policy Paper at 16. This statement only presents the gener-

al rule. A river such as the Charles could presumably be protected as a § 4(f) resource if it were formally designated or administered as a protected park or recreation area. The plaintiffs claim that the New Charles River Basin has been designated as a § 4(f) resource by Massachusetts statute, as well as by formal MDC designation.

Chapter 465 of the Massachusetts Acts of 1903 created the Charles River Basin Commission and provided for construction of the dam that currently exists at the Museum of Science. Upon completion of the dam, the metropolitan park commission was to "have exclusive control of the dam and lock and of the basin and river between the dam and the city of Waltham, as a part of the metropolitan parks system, ..." Mass.St.1903, ch. 465, § 7, Tab 3 to Cambridge Appendix.

A 1909 statute in turn defines the term "basin"" to refer to "the dam and any lock, highway, park, parkway, drawbridge or sluiceway constructed in connection therewith under authority of said chapter four hundred and sixty-five and acts in addition thereto and in amendment thereof, ... the Charles river and the waters thereof, including the public navigable arms, tributaries and inlets thereof, whether covered by ice or not, lying between said dam constructed under authority of said chapter four hundred and sixty-five and the lower dam across said river at Watertown, and all lands or rights therein taken by eminent domain or otherwise acquired by the Charles river basin commission. . . ." Mass.St.1909, ch. 524, § 2, Tab 4 to Cambridge Appendix. The 1909 Act, in the following section, includes the same language as the 1903 Act concerning the park commissions control over the basin as part of the parks system. *Id.* at § 3. In addition, § 3 of the 1909 Act continues, stating that "[t]he metropolitan park commission shall also have and exercise over said basin all other powers, duties and liabilities now conferred or imposed upon said commission. . . ." *Id.*

In 1962, the Massachusetts Legislature acted again, adding the New Charles River area to the "basin" as defined in the 1909 Act. Mass.St.1962, ch. 550, § 2, Tab 5 to Cambridge Appendix. This Act specifically refers to the language quoted directly above in § 2 of the 1909 Act for its definition of "basin."

The defendants assert that the "separate enumeration of 'waters' and 'park' in the definition of 'basin' [in the 1909 Act] certainly suggests that the Legislature viewed those terms as distinct, rather than synonymous" as the plaintiffs claim. Def.'s Memo. at 7. This would represent a general transfer of a multi-use parcel to the parks commission, which would have authority over it in all of the ways enumerated.

In reading the statute to give meaning to all of its terms and seeking to construe it consistently as a whole, I find the defendants' review of the statutes in question and their determination that the statutes do not represent a formal designation of the entire Charles River, particularly the New Charles River Basin, as protected by § 4(f) to be reasonable.

A review of the history of use of the disputed portion of the river reinforces my conviction that the FHWA did not act in an arbitrary and capricious manner. The statutory language itself reveals the multiple uses for this portion of the river at the time the legislation in question was passed. Section 5 of the 1909 Act specifically states that the park commission may "make reasonable rules and regulations, not unreasonably impairing freight traffic, for the care, maintenance, protection and policing of said basin." Mass.St.1909, ch. 524, § 5. For most of Boston's history, this portion of the Charles River has been a transportation corridor. *See* 11/9/90 Letter, December 1993 FSEIS/R, Part I, Section 4(f) Evaluation, Appendix 3, Exhibit A ("MDC plans for use of this downstream portion of the Basin extension include continuation of its existing navigation, flood control, and associated water management functions, along with transportation purposes, as the primary uses"). It does not comport with common sense to strain in reading the legislation proffered by the plaintiffs in a manner which is both seemingly internally inconsistent and against the weight of practicality.

As the defendants observe, the Massachusetts Legislature can and has exercised its

powers to make formal and explicit park designations. *See* Mass.St.1970, ch. 542 (creating Boston Harbor Islands State Park); Mass.St.1970, ch. 542 (creating Cape Cod Ocean Sanctuary). The Legislature took no such clear action here. In reviewing the Massachusetts Legislature's actions with regard to the designation of the New Charles River Basin I do not find that the FHWA acted arbitrarily and capriciously in finding the legislation cited by the plaintiffs insufficient to constitute a formal § 4(f) designation.

 This does not, however, end my analysis with respect to this portion of the river. The plaintiffs further allege that the MDC has made a formal designation of the New Charles River Basin as a protected park or recreation resource. Defendants respond that the MDC formally declined to designate this and other areas as § 4(f) resources in the letter of November 9, 1990 and that it was not arbitrary and capricious in accepting the contents of this letter as the MDC's formal position with respect to these parcels.

Upon review of the numerous letters and memoranda flowing in and out of the MDC throughout the lengthy review period, I find that the documents represent a written log of an ongoing conversation in which the MDC attempted to decide what its formal position regarding the New Charles River Basin and other disputed § 4(f) resources would be. The documents at no point provide a formal designation of this portion of the river as a § 4(f) resource, although at times they appear to represent the optimistic views of various MDC employees and officials in attempting to present an expanded view of the river as a park to other MDC employees or to outside agencies. These optimistic statements do not, however, constitute a formal and clear designation of the New Basin as a § 4(f) resource.[23] At most, they represent provisional, and often conflicting attempts, by various elements within the MDC to develop a position at various points in the process. Viewed overall, the conflict at most demonstrates that the MDC officials could not agree to formally designate the New Basin

as a 4(f) resource and therefore failed to do so. In conjunction with the MDC's continued failure to administer the New Charles River Basin as a park, it is not surprising that the FHWA in review of the MDC's action would find that no § 4(f) designation was ever made.

As is evident from the summary in Appendix II of the numerous letters the MDC submitted to state and federal agencies, the MDC position regarding potential § 4(f) resources was constantly under review and was a point of controversy within the agency. But the MDC in its formal communications with the FHWA was explicit that it had designated a portion of the river *upstream* of the New Basin as protected park land. The MDC, however, in its formal communications never—although obviously struggling with the question rather than being oblivious to it—designated the New Basin as a § 4(f) resource.

The FHWA's multiple use regulation supports the FHWA's decision. The MDC plainly proceeded under 23 C.F.R. § 771.135(d) when it designated the portion of the Charles River upstream of the old dam (the Lower Basin) as recreational but declined to make the same designation for the portion of the river downstream of the MBTA bridge (the New Basin). This necessarily communicated that the MDC had made an affirmative determination that the entire site was not significant under 23 C.F.R. § 771.135(c) and therefore the entire river is not a § 4(f) resource. Once the multiple use regulation comes into play, the agency managing the area may designate portions of the multiple use area, here portions of the river, as parks or recreation areas.

The MDC expressly designated the portion of the river above the old dam as a park. This park site, according to the regulation, in its entirety has been designated as protected. The remaining portions, unless explicitly designated as significant park or recreation areas, remain non-protected as multiple use sites. In accordance with this language, by explicitly designating the upper portion of

---

**23.** The record is replete with various documents which express conflicting views as to the MDC's position regarding this property. In Appendix II to this Memorandum, I provide a brief summary of these documents and discuss which documents the FHWA chose to rely upon.

the Charles River as a significant park, the New Basin has been left undesignated. The administration and use of the New Basin primarily for transportation purposes supports the FHWA's application of this regulation to the various portions of the river.

The MDC position was also consistent with the practice regarding the future prospects for the New Basin. The New Basin has been administered and will be administered as a transportation corridor in the future. *See* 11/9/90 Letter, December 1993 FSEIS/R, Part I, Section 4(f) Evaluation, App. 3, Ex. A.

Without a specific legislative designation or an explicit designation by the state agency with control over the property that the resource was within the scope of § 4(f), the FHWA acted reasonably in reviewing all of the conflicting documents and deciding that the New Basin itself was not a protected resource under § 4(f). The FHWA could properly look first to the formal correspondence it received from the appropriate state agency, the November 9, 1990 Letter, and find that it only described designation of certain land and river resources. These designated resources did not include the disputed portion of the New Basin. The formal MDC position was consistent with the actual multiple use the New Basin has been and, for the foreseeable future, will be put to. To be sure, documentation provided by plaintiffs indicates that MDC personnel took positions with respect to this parcel in internal drafts, letters and memoranda to agencies other than the FHWA that blur the picture as to

what the MDC's formal position would be. But the critical determinative issue is its formal communication with the FHWA. In the final analysis it is clear from the record that the MDC failed explicitly to designate the New Basin as a § 4(f) park or recreation area.

■ I conclude it was not arbitrary and capricious for the FHWA to determine that the portion of the Charles River between the Museum of Science and the New Dam was not a protected § 4(f) resource. The state agency having jurisdiction over the parcel in question has declined to designate the New Basin as recreational in nature and has also failed to administer it as such over the years and has no prospects for doing so—except as part of a multiple use area—in the future. The FHWA effectively affirmed the MDC's decision not to designate the New Basin as a § 4(f) resource. The FHWA properly relied upon the local agency's viewpoint on this issue. *See Concerned Citizens,* 641 F.2d at 7.[24]

### 2. *CANA Lands*

■ On June 13, 1975, the FHWA completed and issued a FEIS for a project on I–93/Route 1 which is referred to as the CANA project. In 1987, the Massachusetts Department of Environmental Protection ("DEP") issued a license pursuant to Mass.Gen.L. ch. 91 for the property which I will refer to as the CANA parkland. *See* A.R.Doc. 431. The license included certain conditions for

---

**24.** Cambridge additionally cites to comments from the DOI and that National Trust for Historic Preservation ("NTHP") to support its claim that the portion of the river downstream of the Museum of Science is subject to § 4(f). Specifically, Cambridge cites to the DOI's comments on the 1993 DSEIS/R, December 1993 FSEIS/R, Part II, Comment F–6, as well as the DOI's comments on the December 1993 FSEIS/R, A:R.Doc. 307, and the NTHP's September 21, 1990 letter to the EOEA and the FHWA.1990 FSEIR, Part IV, Book 2, page IV 5.5–351. The FHWA reviews the decision of the MDC, as the agency with jurisdiction over the property, and is allowed to determine for itself the weight it will give to other agency positions. *Coalition on Sensible Transportation,* 826 F.2d at 65 (DOI's position, which contradicted that of the local agency, while relevant, was not determinative); *see also Maryland Wildlife Federation v. Dole,* 747 F.2d

229, 238 (4th Cir.1984) (DOI and EPA objections do not constitute vetoes over the Secretary's decision and comments "did not necessarily eliminate the power of the Secretary to give greater weight to other information and views in the administrative record"). I recognize that the opinion in *Maryland Wildlife Federation* has been vacated, 22 E.R.C.1910 (4th Cir.1985). That opinion vacating the decision reported at 747 F.2d 229 is itself not published in F.2d and is not available on Westlaw. Subsequent cases, however, cite the original decision. *See, e.g., Lake Hefner Open Space Alliance v. Dole,* 871 F.2d 943, 947 (10th Cir.1989); *Ashwood Manor Civic Association v. Dole,* 619 F.Supp. 52, 81 (E.D.Pa. 1985). For present purposes, I find the parenthetical proposition quoted above from *Maryland Wildlife Federation,* whether applicable precedent in the Fourth Circuit any longer or not, to be well founded.

the MHD to meet, and included requirements to create certain parkland areas within the site and transfer them to the MDC upon completion of the project. *Id.* As of 1987, the CANA design included loop ramps to link with the Central Artery structure. *Id.* at 5. As the CA/T project developed, the CANA project had to be redesigned. The MHD constructed temporary ramps to benefit motorists while this was done and the DEP issued a new license for this temporary project in 1993. *See* A.R.Doc. 152, 1/8/93 MHD Letter; A.R.Doc. 429, 1993 License. The temporary measures were clearly designed to accommodate a variety of options for the Charles River Crossing in order eventually to create a unified project efficiently. *Id.*

The plaintiffs argue that the CANA project and therefore the parkland it is supposed to create, are separate and distinct from the CA/T project and therefore protected by § 4(f). Cambridge contends that through the license the MDC has designated the CANA parkland as being subject to § 4(f). Cambridge Memo. at 38; 8/27/90 Letter, 1990 FSEIR, Part IV, Book 1 at page IV 5.2–92. The plaintiffs further contend that the CANA project has been completed and that therefore the property has been transferred to the MDC and designated as protected parkland.

The defendants state that the contested parkland is being created by the same highway project now being challenged. The documentation supports this understanding. While it is true that the CANA project construction is essentially complete, this is so because of the delays associated with the CA/T project. But *temporary* loop ramps were built for the CANA project until a final design could be built to connect to the Central Artery as created under the CA/T project. As such, the design of the CANA ramps in question, as well as the final plans for the parkland being created by that project, remain on hold until final design of this project. The design of the CA/T project directly relates to the design of the CANA project and the parks created by the CANA project will only come into existence because of the CA/T project. Therefore, it cannot be said that the CANA parklands are distinct

from this larger project and have already been designated by the MDC as protected. As case law indicates, the intent and purpose of § 4(f) can only practically be met when there is a finding that there is no constructive use of parkland when a highway and a park are planned jointly. *Sierra Club v. Department of Transportation*, 948 F.2d 568, 575 (9th Cir.1991). It affronts common sense to say that the project which creates parkland must also attempt to avoid use of or mitigate use of that same park in its design.

Plaintiffs also cite to many of the same documents referenced above with respect to the New Charles River Basin, with the same arguments concerning conflicting MDC positions in its various letters. In this connection, they again challenge the November 9, 1990 Letter. For the reasons discussed more fully above, I do not find that these documents require a finding by me that the FHWA's decision was arbitrary and capricious based on documents which in the end failed to provide the explicit designation which the plaintiffs so desire.

I conclude that the FHWA did not act arbitrarily and capriciously in determining that the CANA parkland is not protected by § 4(f).

### 3. *MBTA Walkways*

The plaintiffs challenge the FHWA's failure to find that the MBTA walkways adjacent to the North Station railroad bridge and parking lot are not protected resources. In connection with the construction of a bridge over the Charles River, the MBTA obtained license number 1111 in 1984 under Mass. Gen.L. ch. 91. MBTA License, Tab 9 to Cambridge Appendix. The License states that "[s]hould the [MDC] or other public agency with authority over parks and recreation land along the Charles River in the City of Boston, determine that it would be appropriate to provide public access along the south bank of the Charles River over and across the commuter rail tracks and adjacent areas for recreational purposes of scenic access and enjoyment to and along the tidelands, the licensee shall allow such access and any necessary structure(s) to be constructed and maintained in accordance with

any reasonable or necessary conditions to ensure the safe operation of the commuter rail service." *Id.* at 3.

The plaintiffs' argument rests primarily on the fact that the walkways are included as an existing § 4(f) resource on the draft map of MDC planning from 1989. *See* MDC Plan, Tab 12 to Cambridge Appendix. This draft plan is not, however, an explicit § 4(f) designation of the walkways as recreation or parkland. The defendants observe further that the MBTA license grants the MDC the right to undertake to develop such a walkway but that the MDC has not done so or even planned to do so and that the current path is a dirt path which ends at a fence short of the MBTA bridge. The plaintiffs assert that these paths along the MBTA tracks are just the type which need to be protected in accordance with "FHWA policy, which provides that 'designated scenic or recreational trails on publicly owned land' are subject to § 4(f)." *See* Cambridge Memo. at 23 (citing Policy Paper at 16). These walkways which "link MDC areas to Science Park Station and the North Station Terminal," MBTA and MDC Walkways Transfer Agreement, Tab 10 to Cambridge Appendix at 1, are simply not for significant recreational use. They are merely passages between park nodes and MBTA stations.[25]

While the MDC in letters throughout 1990 mentioned that it had obtained care and control of the walkways, it did not, as it did with other § 4(f) resources, request that the walkways be included as protected parks and it did not designate the walkways as recreation or parkland. In the November 9, 1990 letter, the walkways were not mentioned at all. The MDC itself declined to designate the walkways as a § 4(f) resource. I conclude the FHWA did not act arbitrarily or capriciously in failing to treat them as such.

## C. Will There Be Constructive Use of Protected § 4(f) Resources?

■ Because I have found that the disputed New Basin, CANA lands and MBTA walkways are not designated § 4(f) resources, the plaintiffs' arguments that those sites will be constructively used is not at issue. What remains at issue are the plaintiffs' contentions that the NRT constructively uses three upstream parks: the portion of the Charles River upstream of the old dam, the future Nashua Street Park, and the future park at the former GSA site.

■ Federal regulations provide that constructive use occurs when "the transportation project does not incorporate land from a section 4(f) resource, but the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify a resource for protection under section 4(f) are substantially impaired. Substantial impairment occurs only when the protected activities, features, or attributes of the resource are substantially diminished." 23 C.F.R. § 771.135(p)(2). The regulations further state that the FHWA "is not required to determine that there is no constructive use. However, such a determination could be made at [its] discretion." 23 C.F.R. § 771.135(p)(3). The burden rests on the plaintiffs to demonstrate that a project will involve a constructive use of protected park or recreation lands. *Arkansas Community Organization for Reform Now v. Brinegar,* 398 F.Supp. 685, 692 (E.D.Ark.1975), *aff'd,* 531 F.2d 864 (8th Cir.1976) (citations omitted).

Courts have applied the doctrine of constructive use to "off-site activities . . . if they could create sufficiently serious impacts that would substantially impair the value of the site in terms of *its prior significance and enjoyment." Adler,* 675 F.2d at 1092 (*citing D.C. Federation of Civic Associations v. Volpe,* 459 F.2d 1231, 1239 (D.C.Cir.1971), *cert. denied,* 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972)) (emphasis added). What in other contexts has been referred to as a *de minimis* exception has also been applied in the constructive use context. *Coalition on*

**25.** Although I focus in the text above on the walkways along the MBTA bridge subject to a Chapter 91 license, I note that the plaintiffs also make reference to the walkway on the south bank of the Charles from the MBTA bridge to Paul Revere Landing Park. The analysis in the text above is equally applicable to the decision not to designate this walkway as a § 4(f) resource.

*Sensible Transportation,* 826 F.2d at 63. Based on this rationale, there will be no "use" of a property " 'where an action will have only an insignificant effect on the existing use of protected lands.' " *National Parks and Conservation Association v. Federal Aviation Administration,* 998 F.2d 1523, 1531 (10th Cir.1993) (*quoting Allison v. Department of Transportation,* 908 F.2d 1024, 1028 (D.C.Cir.1990)).

Constructive use analysis for each of the relevant parcels appears in the 1990 FSEIR, the 1991 FSEIS and the December 1993 FSEIS/R. The plaintiffs contend that the FHWA acted arbitrarily and capriciously because in its December 1993 FSEIS/R discussion it relied on the 1991 FSEIS, which concluded that there was not a constructive use, or, if there was, it was substantially the same for all of the various alternatives, rather than the 1990 FSEIR which plaintiffs claim held that there was constructive use of these areas. Defendants respond that it was not arbitrary and capricious of them to determine that there was no constructive use based on the analysis of Scheme Z in the 1991 FSEIS or to determine in the December 1993 FSEIS/R that the Preferred Alternative did not constructively use the parcels in question because any impact it would have was the same or less than that of Scheme Z.

Constructive use analysis for the various disputed parcels is procedurally and substantively similar. I will discuss only the evaluation of the upstream portion of the river in any detail here because my analysis and conclusions with respect to this parcel are essentially the same for the other parcels.

With respect to the upstream section of the river, the two potentially significant impacts are noise and visual impacts. The 1990 FSEIR stated that there *might* be a constructive use of this portion of the river, commenting that "[i]n an urban park, the contrast between the values of the immediately surrounding park elements such as water surface and landscaped banks seen against large urban background elements is not necessarily adverse and may even be viewed as positive, depending on the merits of the bridge design and the personal taste of each user." 1990 FSEIR, Part III, at p. III-

11. The report continued that "[i]f visual impacts of the highway are considered to affect recreational boating uses in a manner that amounts to constructive use, the visual impacts of [Scheme Z and Scheme T Modified] are equal in terms of the attributes and activities important to the Section 4(f) resource." *Id.* (emphasis added). The evaluation did, however, find that there "would be substantial noise impacts in either scheme, which could substantially impair use of the Section 4(f) resource." *Id.*

The 1991 FSEIS constructive use analysis which the plaintiffs challenge states that "[t]here would be noise impacts in either scheme [Z or T Modified]" but that harm could be minimized overall during design review and that "[a]s the [area] will be used and traversed predominantly by small motorcraft, which are themselves noise sources, highway noise would not significantly affect recreational boating." 1991 FSEIS, at pp. III-15-16. With respect to the visual impacts, the FHWA explained that:

[h]ighway structures would alter the visual context compared to the no-build particularly by introducing bridges immediately downstream of the railroad crossing. However, these structures do not obscure the primary views from boats using the park, which are of the water surface, the other boats on the river, and recreational activity on the banks, all of which are in the foreground with the bridges and ramps in the background. View to some downstream landmarks would be reduced or eliminated, but these views are already highly constrained by the railroad crossing which is 8 to 10 feet above the water level of the river,

*id.,* and concluded, "visual impacts would adversely affect use of the Charles River Basin extension recreation area, but there is not a sufficient change in character and magnitude from the no-build in the attributes and context of this portion of the river to substantially impair recreational use." *Id.* at III-16. So although the FHWA determined that there would be some noise and visual impacts on the river, it found these impacts not to be significant given the existing urban context

of the area in a no-build context and determined that there was no constructive use.

The December 1993 FSEIS/R constructive use analysis began with the 1991 FSEIS evaluation, which found that there was no constructive use of the river under Scheme Z. The 1993 FSEIS/R evaluation then proceeded to compare Scheme Z, the Preferred Alternative and the other remaining alternatives for their comparative impacts and concluded that the Preferred Alternative did not constructively use the Charles River Basin Extension Recreation Area. As foundation for this finding, the FHWA noted that the "Preferred Alternative and other new alternatives [including the realigned RRT] substantially reduce visual impacts" and "marginally reduce" noise impacts when compared to Scheme Z. For example, the evaluation stated that the new alternatives reduced the number and height of loop ramps on the river bank and also included alterations which would result in ramps being further set-back from the river than in Scheme Z. If Scheme Z would not constructively use this parcel, then neither would these alternatives.

█ Reviewing the three different constructive use analyses from 1990, 1991 and 1993 on this portion of the river, I do not believe that the FHWA's conclusion that the Preferred Alternative would not constructively use the river was arbitrary or capricious. The FHWA identified the various studies conducted and models examined in its analysis, it clearly explained its reasoning for finding that although there were noise and visual impacts those impacts were not substantial given the urban context of the project and the existing impacts under a no-build option, and then it reached a conclusion based on those findings. This analysis is reasonable in its approach and its conclusion. For a constructive use to occur, there must be substantial impairment of the property over its existing use and significance. At the present time there are substantial noise and visual impacts from existing structures such as the MBTA bridge. It was within the discretion of the FHWA to conclude that the impacts found, while adversely affecting the parcels, did not reach a degree as to be considered substantial enough to constitute a constructive use.[26]

I conclude the FHWA determination of no cognizable constructive use was not arbitrary and capricious.

### D. Have Harms to Protected § 4(f) Resources Been Minimized?

The plaintiffs acknowledge that all of the alternative designs for the CA/T require the use of protected parkland and therefore do not argue that the defendants have violated § 4(f)(1). Instead, the plaintiffs allege that the defendants violated § 4(f)(2)'s requirement to minimize harm to protected resources.

█ Section 4(f)(2) states that the Secretary of Transportation may only approve a project if "the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use." 49 U.S.C. § 303(c)(2). This subsection imposes the "duty to utilize all possible

---

**26.** Although I analyze in greater detail elsewhere in this memorandum the FHWA's choice of the NRT as the Preferred Alternative under the standards of *Overton Park*, I note here that even if the FHWA did err in concluding that there was no constructive use of these parcels, it would not change my analysis of the FHWA's choice. In the December 1993 FSEIS/R, with respect to each parcel, the FHWA stated the corresponding level of effects of each of the alternatives with respect to the others and found that Preferred Alternative minimized impact more than or at least as much as the other options. The FHWA also compared the alternatives to each other with respect to the three parcels in its comparison of overall impacts to § 4(f) resources despite its finding that there was no constructive use. *See* December 1993 FSEIS/R, Part I, Final § 4(f) Evaluation, pp. 4(f) 15–26. Given that the no-build alternative has been rejected as untenable, if these parcels were determined to be constructively used, the FHWA would have to choose the option which least affected § 4(f) resources. In a situation in which different alternatives resulted in substantially the same degree of impact, the FHWA would be free to choose among them. *Louisiana Environmental Society v. Coleman*, 537 F.2d 79, 86 (5th Cir.1976). Because the Preferred Alternative in each instance here is the option or one of the options resulting in the least impact on these parcels, the FHWA in the end acted reasonably in choosing the NRT alternative.

planning to minimize harm.... Relocation of the highway through another portion of the section 4(f) area or through other section 4(f) properties must be considered as a means of ·minimizing harm." *Druid Hills Civic Association, Inc. v. Federal Highway Administration,* 772 F.2d 700, 716 (11th Cir. 1985) (citation omitted) (§ 4(f)(2) requires a simple balancing process which totals the harms of each alternative and selects the option which does the least overall harm).

 The directive of § 4(f)(2) does not mean that the FHWA must always choose the route which does the least harm to protected areas using any means technically possible. The subsection, although it does not expressly state that efforts to minimize harm must be feasible and prudent, "clearly implies" that feasibility and prudence are factors. *Louisiana Environmental Society,* 537 F.2d at 86. The process of weighing these factors involves distinct reasoning, however. "A route may be rejected because it does not minimize harm only for reasons relevant to the quantum of harm which will be done to the recreational area. If it does minimize harm, a route may be rejected only for truly unusual factors other than its effect on the recreational area." *Id.* The Secretary is free to choose between alternatives which impose equal or substantially equal damage to protected parks. *Coalition on Sensible Transportation,* 826 F.2d at 65 (citations omitted). To make such a choice, there does not need to be a formal finding under § 4(f) that the harms between different alternatives are substantially equal. *Id.* at 66. As long as it can reasonably be viewed that the chosen plan minimizes harm, then the Secretary has acted within the scope of his or her authority.

 A court must carefully review the record to "insure that there was 'consideration of the relevant factors and [no] clear error of judgment,'" in the FHWA's decision. *Coalition on Sensible Transportation,* 826 F.2d at 66 (quoting *Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823–24). The FHWA must set forth alternatives "sufficient[ly] to permit a reasoned choice," but is not required to have "consider[ed] in detail each and every conceivable variation of the alternatives stated." *Monroe County Conserva-*

*tion Council, Inc. v. Adams,* 566 F.2d 419, 425 (2d Cir.1977), *cert. denied,* 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978) (internal quotations and citations omitted). The First Circuit has held that under § 4(f), "agency determination that a particular plan minimizes harm ... deserves even greater deference than agency determination concerning practicable alternatives." *Conservation Law Foundation v. Federal Highway Administration,* 24 F.3d 1465, 1476–77 (1st Cir.1994) (citations omitted). As long as these steps are taken, the court must accept the agency's decisions. *Citizens for the Scenic Severn River v. Skinner,* 802 F.Supp. 1325, 1334 (D.Md.1991), *aff'd,* 972 F.2d 338 (4th Cir. 1992) (citations omitted). It is not the role of the court to "fly speck" in its review to ensure that each and every factor and standard was considered. *Adler,* 675 F.2d at 1095.

 Under the feasible and prudent prong of the § 4(f)(2) analysis, the agency can consider a number of factors in assessing the various alternatives. Included among those factors which have been held to be relevant and acceptable justifications for rejecting an alternative are concerns such as the inability to accommodate future traffic volume, inability to satisfactorily accomplish the goals of the project, excessive cost, aesthetics, and construction (and other short-term) impacts or safety concerns. *Committee to Preserve Boomer Lake Park v. Department of Transportation,* 4 F.3d 1543, 1550 (10th Cir.1993) (citations omitted); *Wade v. Dole,* 631 F.Supp. 1100, 1111–12 (N.D.Ill.1986), *aff'd,* 813 F.2d 798 (7th Cir.1987); *Citizens for the Scenic Severn River,* 802 F.Supp. at 1337. Although these factors are to be considered individually, courts have stated that if no one of these factors alone is sufficient to justify rejecting a particular alternative, the cumulative effect of some of these factors may, nevertheless, be sufficient to support an agency's decision. *Id.* (citation omitted); *Eagle Foundation, Inc. v. Dole,* 813 F.2d 798, 805 (7th Cir.1987).

.In the December 1993 FSEIS/R, the FHWA plainly stated that "on balance, the Preferred Alternative, while substantially similar to the other new alternatives, mini-

mizes overall harm to 4(f) parkland resources." December 1993 FSEIS/R, Part I, Final § 4(f) Evaluation, at page 4(f)–32. The Geer plaintiffs assert that the FHWA improperly weighed short-term impacts on the protected areas more heavily than long term impacts. Cambridge asserts three[27] additional reasons why the defendants have failed to meet the minimization · requirement of § 4(f)(2): 1) the FHWA's analysis omits several § 4(f) resources; 2) defendants used varying levels of mitigation to equalize the impacts of the various alternatives; and 3) defendants failed to consider the R–RRT design adequately, which Cambridge states would have resulted in reduced impacts to park lands.

I observe at the outset that Cambridge's first argument fails because I have held that the contested parcels were not protected by § 4(f), and therefore the FHWA did not need to consider the effect on those areas in its § 4(f) evaluation and its efforts to minimize impacts.

Addressing the other arguments made by plaintiffs, I start first with the FHWA's rejection of other alternatives, particularly the R–RRT, because they resulted in either greater or substantially the same impact on protected parcels or because they were not prudent and feasible based on a variety of factors.

■■■ As a preliminary matter, Cambridge alleges that the FHWA failed to evaluate the R–RRT design option in enough detail. With respect to a claim that other alternatives should have been considered, it is clear that the FHWA has more than met its responsibilities. The agency was "not obligated to consider in detail each and every conceivable variation of the alternatives stated: it need only set forth those alternatives sufficiently to permit a reasoned choice." *Ash-*

*wood Manor Civic Association v. Dole,* 619 F.Supp. 52, 80 (E.D.Pa.1985) (internal quotation marks omitted) (quoting *Monroe County,* 566 F.2d at 425).

An examination of all of the documents demonstrates that the defendants fully evaluated the R–RRT alternative, in addition to numerous other options. The December 1993 FSEIS/R examines the R–RRT alternative under a one-way and a two-way tunnel variation. December 1993 FSEIS/R, Part I at 2–19–21; 1993 FSEIS/R at 2–10. Although the FSEIS/R acknowledged that the refinement would eliminate many of the concerns of the RRT by moving the tunnel out of the park parcel downriver to the non-protected area of the New Basin, it also stated that it would not cure other significant problems. *See id.* The R–RRT plan would still preclude local traffic from Beacon Hill and East Cambridge from accessing the northbound tunnel at Leverett Circle (a redesign of which would result in other design drawbacks similar to those under the refined 8. 1D Mod 5 plan). *Id.* In addition, the FSEIS/R identified other factors which resulted in a finding that the R–RRT did not result in less impact on the protected resources and if it did it was not feasible and prudent: the R–RRT alternative would create more severe temporary construction impacts, as well as potential interference with flood control pumps at the Charles River Dam; the R–RRT involved a longer construction period and greater construction difficulties; and the R–RRT would use the same loop ramp structures as the NRT, therefore resulting in no less visual impact than the NRT plan. In addition, the FSEIS/R compared the NRT to the R–RRT and found that the R–RRT would have greater impact on historical resources such as the Registry of Motor Vehicles Building and the Charles River seawall, and would also re-

---

**27.** Although in its initial brief Cambridge asserted four reasons why the FHWA's actions were inadequate to meet the requirements of § 4(f), in its reply brief, Cambridge acknowledged that its earlier claim under § 4(f) that "the A.R. overwhelmingly supports the conclusion that river tunnels reduce impacts on recreational resources by allowing for narrower bridges" was without strength in this analysis because the December 1993 FSEIS/R relies upon the alleged adverse

impact of river tunneling only in the context of NEPA, but not as a § 4(f) issue and as such Cambridge is no longer pressing this issue. In its reply brief Cambridge instead asserts in place of its argument regarding the reduced effects of tunnel options, the claim that the FHWA improperly balanced short and long term impacts in its decisions—the same argument raised by the Geer plaintiffs.

quire the building of a larger, above-ground ventilation building. *Id.* at 4(f)–26, 28, 31, 32. In light of all of this discussion of the R–RRT in the FSEIS/R and the comparisons between the NRT and the R–RRT which indicate that at best the impact of the R–RRT is the same as that of the NRT, I cannot find that the FHWA failed to adequately consider the R–RRT or that the FHWA acted arbitrarily and capriciously in not choosing the R–RRT as the Preferred Alternative.

■ Plaintiffs further claim that the FHWA improperly varied mitigation levels and therefore violated § 4(f)(2). At times Cambridge appears to be arguing that the FHWA improperly adjusted mitigation for various plans, therefore resulting in a situation in which it could state that the NRT had the least or at least the same level of impact as the other plans only because the NRT received greater levels of mitigation. At other times Cambridge states that the FHWA violated the statute because it created a single mitigation plan for all alternatives instead of formulating individual plans developing all possible mitigation for each alternative.

The statute states that a chosen project must "include[ ] all possible planning to minimize harm" to the park. 49 U.S.C. § 303(c)(2). That appears to state that the agency must consider a plan based on the assumption that all possible commitments to mitigation within reason will be made and enforced. For that, there would usually be a different balance of mitigation efforts for different alternatives. In this case, it appears that the mitigation required is primarily to diminish adverse visual and noise impacts. Nothing in the record indicates that the FHWA first picked the design it wanted and then tailored a mitigation package around it to ensure that the net impacts of that alternative would be less or substantially the same as the other alternatives. The FSEIS/R compares the impact of each alternative on each resource, stating how, if at all, these impacts could be reduced and balanced. The September 30, 1993 letter which the plaintiffs cite in support of their argument only serves to demonstrate that the FHWA

met its obligations under § 4(f). That letter states that mitigation "appropriate to each alternative" was fashioned. That is what the statute calls for.

In sum, the FHWA properly considered a vast number of alternatives, narrowed the possible candidates and then compared the impacts on § 4(f) resources of each meaningful alternative. In the December 1993 FSEIS/R, the FHWA analyzed each § 4(f) resource and addressed how each of the alternatives would impact the property and how each impact could be mitigated. Based on this thorough analysis, the FHWA balanced all of the various impacts and determined that the NRT presented the alternative with the least overall impact and chose the NRT as the Preferred Alternative. In addition the 1993 FSEIS/R provided more than adequate information as to why the other alternatives should be rejected as not feasible or prudent. Given all of this, I cannot find that the FHWA acted in any way arbitrarily and capriciously under the minimization of harm efforts of § 4(f)(2).

There is no question that the NRT impacts protected parks, but this does not mean that it was unreasonable for the defendants to choose it as their Preferred Alternative. The twelve years of study and this lawsuit demonstrate that there are conflicting viewpoints as to the decision to proceed with the NRT alternative. The record demonstrates, however, that the FHWA has thoroughly analyzed the various options and provided adequate reasoning for its choice. I conclude the process the FHWA followed and its ultimate decision were not arbitrary and capricious.

### E. Are the Defendants Adequately Committed to Mitigation?

■ Section 4(f)(2) requires that any chosen project must include "all possible planning to minimize harm" to protected parks. In the December 1993 FSEIS/R the defendants identified an extensive list of mitigation measures for each of the protected parcels. December 1993 FSEIS/R, Part I, Final § 4(f) Evaluation, at 4(f)–19–21. The plaintiffs complain that the defendants have failed to meet the requirements of § 4(f)(2) because

they have not sufficiently insured that the mitigation measures will be implemented, adequately described a plan to obtain the necessary .funding, and furthermore wrongfully agreed to an $80 million cap on mitigation.

■ The FHWA has an obligation to "implement those mitigation measures stated as commitments in the environmental documents prepared pursuant to this regulation. The FHWA will assure that this is accomplished as a part of its program management responsibilities that include review of designs, plans, specifications, and estimates (PS & E), and construction inspections." 23 C.F.R. § 771.109(b). In addition, "the Secretary must be permitted to make decisions in what might be called a progressive manner—not everything can be pulled together all at once. But when decisions necessary to final approval are made, ... they must be made conditionally and tentatively, subject to readjustment and reconsideration as the process toward final determination goes forward. And final approval must await and be dependent upon completion of this process." *D.C. Federation,* 459 F.2d at 1268.

Here, the MHD and the MDC entered into a Memorandum of Agreement ("MOA") in December, 1993 in which they agreed upon a general mitigation package to be capped at $80 million in 1993 dollars. The MOA listed the mitigation to take place at each protected resource. The plaintiffs say that this agreement determined the mitigation which would take place before the final design was chosen and that the $80 million cap shaped the ultimate mitigation package, therefore violating the statute. After reviewing the record, I conclude that it demonstrates that the defendants could have reasonably concluded that all possible planning had been included for the proposed project to minimize harm to § 4(f) resources.

The MOA was not entered into before the defendants had established that there was no feasible and prudent alternative which would avoid using protected resources. In addition, the nature of this project made it clear what the path would be—across and/or underneath the Charles River at a specific location. Therefore, it is evident that in 1993 it was clear what general path the project would take, and what remained unclear was the final design which would be chosen. It was also fairly evident in 1993 what lands would be affected and what types of impacts would be imposed (i.e. short and long-term construction impacts, visual and noise impacts), although the various designs varied in the specific degree of impact on different resources.

■ The MOA and the list of mitigation efforts contained within that agreement begin with these general conclusions and provide a collection of very broad goals, such as "improve park" or "acquire property" or "provide walkway" for each of the potentially impacted areas. These mitigation plans are a general directive and agreement to commit to making overall improvements as mitigation for the CA/T project. They are not the detailed and specific mitigation designs which the plaintiffs in an ideal world would like. Those mitigation design plans and their mechanics could not be adopted until after final design of the project was determined. As such, the MOA and the December 1993 FSEIS/R provide an outline of the various broad mitigation measures which would need to be implemented in order to minimize harms to the § 4(f) properties. All that is required under the statute is adequate "planning," not detailed designs or documentation or exact details of all financial commitments, *Ashwood Manor,* 619 F.Supp. at 81 (citations omitted), which the defendants have documented in the record of this case.

The various federal regulations cited establish that the FHWA administration is bound to make all effort to ensure that the mitigation they call for in the December 1993 FSEIS/R is implemented. In addition, the 1991 and 1994 RODs and the MOA commit the MHD to mitigation measures and funding, stating that "[t]he state highway agency shall ensure that the project is constructed in accordance with and incorporates all committed environmental impact mitigation measures listed in approved environmental documents unless the State requests and receives Federal Highway Administration approval to modify or delete such mitigation features." (quoting 23 C.F.R. Part 630, Subpart C, Appendix A). The defendants have met their

obligations to incorporate all possible plans to minimize harm to protected properties. Merely because the FHWA is involved in this project and is required to ensure that plans are made to mitigate harms does not mean that the federal government must commit to providing the funding for all mitigation measures in the project.

The record indicates that the defendants analyzed all possible sources of funding and determined that there would be approximately $80 million available from all funds and that therefore efforts to plan and ensure mitigation would occur had to take that figure into consideration. It would be inappropriate for a court to say that planning to minimize harms (which would then be binding on the agencies involved) should not be realistic and base all possible mitigation on some understanding that funds are not limitless. In all projects, budgets must be established. Within the realm of reasonable planning, nothing in the record indicates that the $80 million figure was unreasonable in order eventually to implement the mitigation efforts contemplated by the December 1993 FSEIS/R. It is not the role of a court to engage in detailed budgetary analysis of each listed mitigation measure and attempt to calculate how much it will cost and what source of funding will exist for that effort.

The MOA documents in the record state that there will be ongoing review of mitigation measures to ensure that all commitments will be satisfied and that responsible agencies will make all efforts to obtain any additional funding if necessary. *See* MOA at 20–22; MHD 6/17/94 Office Memo., Tab 15 to Cambridge Appendix at 4 ("budget for the Central Artery/Tunnel Project parkland mitigation measures ... will be reviewed on an ongoing basis ... to maximize federal participation and ensure that all commitments ... are satisfied."); December 1993 FSEIS/R, Part I, Final Section 4(f) Analysis, at 4(f)–18–22. I conclude that the treatment of mitigation commitments by the defendants was neither arbitrary nor capricious.

## F. Conclusion

There is no doubt that the defendants' choice of the NRT design results in environmental impact to § 4(f) resources. There is also no doubt that reasonable minds differ about what constitutes the best option under the guidelines of the statute for the Charles River Crossing. The plaintiffs in this case clearly disagree with the FHWA on numerous grounds. This does not mean, however, that the defendants' actions were arbitrary, capricious or a violation of the statute. In their ideal world, the plaintiffs would have their option prevail or receive limitless funds for mitigation of this project to develop more parklands. Section 4(f), however, does not mandate implementation of plaintiffs' ideal world.

The record demonstrates that the defendants choice of the NRT was reasonable and well-documented, taking into consideration various protected resources and long lists of possible mitigation measures under each of the alternatives. Once the FHWA determined that the river crossing would take place, it considered, in its analysis of options, all possible mitigation for each proposal and determined that the NRT was the one which would result in the least impact under § 4(f). With that decision developed a corresponding understanding that funding for mitigation, like all funding for projects, includes limits. The defendants have demonstrated that their plans for all possible mitigation could reasonably have been provided for within the budget proposed and they therefore chose the NRT plan. Within the record, this decision cannot be said to have been unreasonable.

## VI.

The crossing of the Charles River in the area roughly between what is now the bascule railroad bridge and the New Charles River Dam has been a source of controversy throughout the history of Massachusetts. Stanley L. Kutler, *Privilege and Creative Destruction: The Charles River Bridge Case* 6–17 (ppb ed.1990). The area presents a necessary and convenient corridor for both water and land based transportation to the north and west of the City of Boston. With the arrival of the railroads before the Civil War the area was established in its present role as the crossing and terminus for rail lines entering Boston from the north. *See*

*generally* Richard C. Barrett, *Boston's Depots and Terminals: A History of Boston's Downtown and Back Bay Railroad Stations from 1834 to Today* 1–80 (1996). Given the multiplicity of competing uses for the area, it is not surprising that interested parties have turned to litigation from the very beginning, *see generally Charles River Bridge v. Warren Bridge,* 36 U.S. (11 Pet.) 420, 9 L.Ed. 773 (1837), to sort out their respective rights to control the placement and configuration of the bridges crossing the Charles in this area.

Development of parks on the lands adjacent to the Charles River basin has been no less fraught with controversy over the years. The Bostonian tradition of contentiousness in the development of public projects in this area has been a source of comment by outside observers. In a 1929 article regarding plans for developing the Charles River Esplanade, a *New York Times* correspondent wrote that "[i]n no city is unification of public sentiment more difficult to obtain. In none are more numerous or more various plans offered every time a public improvement is proposed ... Will the thing be done? Who can tell? This is Boston." F. Laurison Bullard, "Park Plan Upsets Beacon Streeters," *N.Y. Times,* Feb. 3, 1929 at 3, 6.

Professor Kutler captured the relevant considerations of policy in the conclusion to his study of the Supreme Court's nineteenth century *Charles River Bridge* case.

> The losers' stakes in the Charles River Bridge case were relatively small, limited to a handful of speculative stock shares. In a modern, complex, and interdependent economy, however, public policy choices are more abrasive to larger numbers of individuals and interests. Innovations can carry losses and irreparable harm in their wake, and the choices we make cannot always be dictated by an optimistic estimate of the greater good of the greater number. Progress exacts a price, and ideally, its costs ought to be distributed according to a delicately balanced concept of the public interest.

Kutler at 170.

At the end of the twentieth century Congress has calibrated that balance and provided for judicial review of the reckoning in this context through NEPA and § 4(f). The ultimate responsibility, however, rests with the authorized state and federal agencies to strike the balance they deem best. Judicial review does not authorize a court to impose a resolution of the competing interests it may find more congenial or satisfying. So long as the appropriate agencies have pursued the necessary process and have carried out all possible planning to minimize harm to properly identified park resources, the courts are obliged to defer to agency determinations. After a full and exhaustive review of the record in this matter, I am satisfied the defendants have met their obligations in connection with the Charles River Crossing element of the CA/T Project.

Accordingly, for the reasons set forth more fully above, I hereby ALLOW the defendants' motions for summary judgment and DENY those of the plaintiffs.

## APPENDIX I

### Dictionary of Acronyms

**BDRC**—Bridge Design Review Committee. Advisory group comprised of representatives from community groups, environmental organizations, business groups and others, established by the EOTC in February of 1991 in order to identify further improvements in the Scheme Z crossing proposal. The BDRC examined more than 20 alternative designs for the river crossing.

**CANA**—Central Artery North Area. The CANA project, now complete and operational, involved improving the I–93 and Route 1 interchange north of the Charles River.

**CA/T**—Central Artery/Tunnel Project, comprised of two parts: first, expanding the Central Artery to eight lanes and depressing it between North Station and Kneeland Street; and second, extending I–90 (Massachusetts Turnpike) through South Boston to Logan Airport through a third harbor tunnel. The Central Artery portion includes a Charles River crossing. At times in the record this term is used to refer to the Charles River Crossing portion alone.

**Charles River Crossing**—A reference to a portion of the Central Artery/Tunnel project

involving the bridge(s)/tunnel(s) being developed to cross the Charles River.

**CIP**—Committee Improvement Packages. Improvement proposals created by the BDRC during 1991 and 1992 in response to criticisms to Scheme Z.

**DEP**—Department of Environmental Protection (Massachusetts).

**DOI**—United States Department of Interior.

**EIS/R**—Environmental Impact Statement or Report

*1982 DEIS/R* —Draft Environmental Impact Statement/Report

*1983 DSEIS/R* —Draft Supplemental Environmental Impact Statement/Report

*1985 FEIS/R* —Final Environmental Impact Statement/Report dated August 1985

*1990 DSEIS/R* —Draft Supplemental Environmental Impact Statement/Report dated May 1990. This publication addressed issues left unresolved in the 1985 FSEIS and evaluated 31 design option alternatives to the 1985 plan, including Schemes S, T and Z.

*1990 FSEIR* —Final Supplemental Environmental Impact Report dated November 1990

*1991 FSEIS* —Final Supplemental Environmental Impact Statement dated January 1991, identifying Scheme Z as the Proposed Action

*1993 DSEIS/R* —Draft Supplemental Environmental Impact Statement/Report dated July 1993, including three new design alternatives, CIP 8.5D Mod 5, RRT and NRT, and comparing them to Scheme Z

*1994 FSEIS/R* —Final Supplemental Environmental Impact Statement/Report dated December 1993, but not issued until February 1994, choosing NRT as the preferred alternative for the river crossing. This document is referred to in the memorandum as the December 1993 FSEIS/R.

**EOEA**—Executive Office of Environmental Affairs (Massachusetts).

**EOTC**—Executive Office of Transportation and Construction (Massachusetts).

**FHWA**—Federal Highway Administration. The agency overseeing the Central Artery/Tunnel project. Designee of the Secretary of the Department of Transportation.

**GSA site**—a § 4(f) resource area first identified in the 1990 DSEIS/R which the MDC had acquired from the General Services Administration in 1989.

**Lower Charles River Basin**—the portion of the Charles River Reservation (including the actual surface water of the river) located between the Cottage Farm Bridge and the Old Charles River Dam. Sometimes also referred to as the Upper Basin.

**New Charles River Basin, New Basin**—the portion of the Charles River between the Old Charles River Dam and the New Charles River Dam. In non-MDC documents, this portion of the river is sometimes referred to as the Lower Basin.

**MBTA**—Massachusetts Bay Transportation Authority.

**MOA**—Memorandum of Agreement among the Mass. EOTC, the MHD and the MDC on December 30, 1993 regarding the CA/T project and related mitigation measures.

**MDC**—Metropolitan District Commission. The state agency with the authority to designate which holdings near the project should be designated as national, state or local significant resources.

**MEPA**—Massachusetts Environmental Policy Act.

**MHD**—Massachusetts Highway Department. Prior to January 1992, MHD was the Massachusetts Department of Public Works.

**Nashua Street parcel**—a § 4(f) resource area first identified in the 1990 DSEIS/R which is located on Nashua Street adjacent to Leverett Circle. At the time of the 1990 report, the MDC was in the process of acquiring this piece of land.

**NEPA**—National Environmental Policy Act.

**NRT**—Non–River Tunnel alternative. Final approved design for the Charles River cross-

ing, which included two parallel bridges (one "signature" cable-stayed mainline bridge and a 4–lane girder bridge).

**Paul Revere Landing Park**—parcels of land located on either side of the Charles River at the New Charles River Dam near North Station. These areas were identified as § 4(f) resources in the 1985 SEIS/R.

**ROD**—Record of Decision issued by FHWA on June 9, 1994, approving the NRT as the preferred alternative for the river crossing.

**R–RRT**—Realigned Reduced–River Tunnel alternative. A proposed design for the Charles River crossing which was a refinement of the RRT.

**RRT**—Reduced–River Tunnel alternative. A proposed design for the Charles River crossing which is similar to 8.1D Mod 5 except that it removed two lanes from the river tunnel and placed them onto the mainline bridge.

**Scheme S Modified**—proposed Charles River crossing alternative outlined in 1990 DSEIS/R which included tunnels beneath North Station and a main line bridge and viaducts for connections.

**Scheme T Modified**—proposed Charles River crossing alternative outlined in 1990 DSEIS/R which included tunnels under North Station, as well as under the Charles River.

**Scheme Z Modified**—proposed Charles River crossing alternative outlined in 1990 DSEIS/R, which included a double-decked bridge and a large nest of loop ramps over the north bank of the Charles River and no tunnels.

**Section 4(f)**—section 4(f) of the Department of Transportation Act. Section 4(f) properties, resources or parklands refers to those properties which must be dealt with under § 4(f).

**Walkways (MBTA)**—walkways on either side of the MBTA tracks near North Station, which were later handed over by agreement to the MDC.

**8.1D Mod 5**—one of the CIP proposed Charles River crossing alternatives to Scheme Z, which included a 10–lane mainline bridge and a tunnel under the Charles River.

## APPENDIX II

On May 1, 1989, MDC Commissioner Ilyas Bhatti wrote to William Twomey of the Massachusetts EOTC and also Director of the CA/T Project. 5/1/89 Letter, A.R.Doc. 420. In this letter, Bhatti reviewed the Massachusetts legislation I summarized above and added that the MDC's position was that "the statutory language is clear: that the Charles River Basin itself is a park, and that this park extends to the new dam." *Id.* at 1. Bhatti wrote again to Twomey in August of 1990, commenting that the legislative history he had discussed in his May letter concerning the New Basin had not appeared in the SEIS. 8/4/89 Letter, A.R.Doc. 423 at 5. Neither of these letters was directed to the FHWA, although both are in the record.

In June, 1990, the MDC formally voted to adopt a May 29, 1990 letter from Bhatti to Dean Stratouly, President of the North Federal Properties Limited Partnership. In that letter, Bhatti addressed issues surrounding development of the Northpoint area of Cambridge (which touches the river near the old dam) and referenced the MDC's long-standing plans to develop the "park land along the charles (sic) River." 5/29/90 Letter, Cambridge Appendix 7, page 1. The Letter and MDC vote references the New Basin through plans and intentions to extend the park system at some time, but do not expressly undertake to designate this portion of the river as parkland. *Id.*

On August 27, 1990, Bhatti wrote to John DeVillars, the Massachusetts EOEA secretary, commenting on the DSEIS. Bhatti repeated to the state agency his earlier statement that the entire Charles River Basin was considered part of the metropolitan park system. 1990 FSEIS, Part IV, Book 1 at 5.2–90–91. The letter also mentions that the MDC has been planning development of the entire area for decades and that it has managed the entire area and undertaken to name individual areas within the park system over the years. *Id.* at 5.2–93.

A few months later, Bhatti finally wrote a letter to Anthony Fusco, the FHWA Region-

al Administrator. This letter appears to be the only one within the record directed to the FHWA. Bhatti stated in this letter that it was "written to provide further clarification of determinations made by the Metropolitan District Commission ("MDC") regarding the park and recreational status of various areas in the Charles River Basin extension affected by the construction of the Central Artery/Third Harbor Tunnel ("CA/T")." 11/9/90 Letter, December 1993 FSEIS/R, Part I, Final Section 4(f) Evaluation, Appendix 3, Ex. A. at 1. Bhatti reiterates that the MDC is a multi-purpose agency which has had jurisdiction over the Charles River Basin extension area since 1961. In describing the various parcels within this area, Bhatti states that "the MDC has designated the portion of the Basin extension river surface area upstream of the railroad bridge, for park and recreational purposes." *Id.* at 2. The letter did not specifically designate the New Basin as a § 4(f) resource, instead stating that:

> With respect to the portion of the Charles River surface located downstream of the railroad bridge in this multiple use area, the MDC recognizes that the potential for similar recreational uses is not present. This portion of the River is constrained in useable width ... Moreover a significant portion of the water surface near the north bank of Paul Revere Landing Park is restricted from use and is inappropriate for small boats.... Although boat passage through this area is permitted, this is not a suitable location for active recreational boating and none currently exists there today due to these conditions. The downstream river area is also partially bordered by lands which are under the ownership of the transportation agencies, including the MBTA and the Department of Public Works.
>
> MDC plans for use of this downstream river portion of the Basin extension include continuation of its existing navigation, flood control, and associated water management functions, along with transportation purposes, as the primary passageway for recreational boats traveling to the park areas upstream ... While this navigational function is supportive of recreational uses, the primary use of the water surface itself downstream of the railroad bridge will not be recreational.

*Id.*

Included in Cambridge's Appendix is a draft of a letter dated April, 1991, prepared to be sent from Bhatti to Fusco. In the section entitled "Section 4(f) Status of the Charles River," this draft letter states that:

> [t]he FSEIS draws unwarranted conclusions from the MDC's November 9, 1990, letter to FHWA. The MDC describes a portion of the Charles River as a "multiple use area." The function of the Charles River as a passageway at this point is specifically compared to the pedestrian connections of the MDC plan for this area. Like the river, these are *passive* recreation areas but nonetheless significant to the value of this area....
>
> Fourth, the FSEIS states that "the MDC has formally designated a new river recreation area which is documented in this Evaluation as an additional 4(f) resource" (p. III–1). The November 9, 1990 letter from the MDC Commissioner does not "designate a new river recreation area." The enabling legislation for the MDC require the vote of the full Commission on such issues. The full Commission voted on May 31, 1990, "to confirm the Commission's plans for the New Charles River Basin Esplanade Extension," including all of the river between the Museum of Science and the new Charles River Dam, while at the same time recognizing that the Charles River Crossing for the CA/T project must pass through this area.

4/8/91 Draft Letter, Cambridge Appendix 10 at 3–4 (emphasis in original). There is no final or signed version of this letter in the record, it does not appear as a comment letter in the 1993 FSEIS/R and it was never sent to the FHWA. According to the attached memorandum prepared by an unnamed staff member at the MDC, the Massachusetts EOEA requested that the MDC not submit this letter directly to the FHWA but instead allow the Massachusetts EOEA to submit all combined comments to the FHWA.

In a letter dated December 30, 1993, from Bhatti to Peter Zuk, the Project Director for the CA/T, the MDC reaffirmed its November 9, 1990 letter and § 4(f) designations, December 1993 FSEIS/R, Part I, Section 4(f) Evaluation, Appendix 2 at page 1, and noted that "there have been no changed circumstances that would necessitate any alteration in park designation in the New Charles River Basin portion of the MDC's Charles River Reservation, as outlined in my letter ... dated November 9, 1990." *Id.*